[No. G040377. Fourth Dist., Div. Three. Apr. 30, 2009.]

In re ANTONIO DE JESUS NUÑEZ on Habeas Corpus.

## Counsel

Equal Justice Initiative of Alabama, Bryan A. Stevenson; and Jack M. Earley for Petitioner Antonio de Jesus Nuñez.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Arlene A. Sevidal, Deputy Attorneys General, for Respondent State of California.

## Opinion

**ARONSON, J.**—Antonio de Jesus Nuñez filed a petition for habeas corpus in the California Supreme Court on grounds, inter alia, that his sentence of life in prison without parole (LWOP) for kidnapping for ransom (Pen. Code, § 209, subd. (a))[1]—an offense he committed when he was 14 years old—constitutes cruel and unusual punishment under the Eighth Amendment or, alternatively, cruel or unusual punishment in violation of article I, section 17 of the California Constitution. Concluding Nuñez established a prima facie case for relief, the Supreme Court ordered Nuñez's prison custodian to show cause before this court justifying the constitutionality of Nuñez's LWOP

---

[1] All further unlabeled statutory references are to the Penal Code.

sentence.[2] After we placed the matter on calendar, petitioner and the Attorney General submitted briefs and argued the matter.

■ Petitioner contends his LWOP sentence violates article I, section 17's proportionality requirement based on, among other factors, his youth, the lack of injury to any victim, and the circumstance that LWOP is not a sentencing option for kidnappers his age who—unlike petitioner—murder their victims. We agree that under our state Constitution the LWOP sentence imposed on petitioner is void both in the abstract for society's most youthful offenders and as applied to petitioner in particular. We do not reach this conclusion lightly. As stated by our Supreme Court in *In re Lynch* (1972) 8 Cal.3d 410, 414–415 [105 Cal.Rptr. 217, 503 P.2d 921] (*Lynch*): "We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone. [Citations.] [¶] Yet legislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition." When such a showing is made, as here, "we must forthrightly meet our responsibility 'to ensure that the promise of the Declaration of Rights is a reality to the individual.' [Citation]." (*Id.* at p. 415.)

And because petitioner is the only known offender under age 15 across the country and around the world subjected to an LWOP sentence for a nonhomicide, no-injury offense, we also conclude his severe sentence is so freakishly rare as to constitute arbitrary and capricious punishment violating the Eighth Amendment. Accordingly, as required by the state and federal Constitutions, we vacate defendant's LWOP sentence on his kidnapping conviction and remand to the trial court for resentencing.

---

[2] The Supreme Court's order states, in pertinent part: "The Director of the Department of Corrections and Rehabilitation is ordered to show cause, before the Court of Appeal, Fourth Appellate District, Division Three, when the matter is placed on calendar, why petitioner's sentence of life in prison without possibility of parole is not grossly disproportionate to his offense. (U.S. Const., amend. 8; Cal. Const., art. I, § 17; *Solem v. Helm* (1983) 463 U.S. 277 [77 L.Ed.2d 637, 103 S.Ct. 3001]; *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].)"

I

FACTUAL AND PROCEDURAL BACKGROUND

We set out the facts of petitioner's offense as stated in our opinion rejecting his direct appeal from his conviction, in which he did not raise the constitutional claims he now asserts. (*People v. Nunez & Perez* (Dec. 21, 2004, G032462) [nonpub. opn.] (*Nunez I*).) As will become apparent, the background circumstances revealed in petitioner's habeas corpus petition present a very different view of petitioner's culpability.

A.  *The Facts of the Offense As Recited in Our Earlier Opinion on Direct Appeal*

"*The Kidnapping of Delfino*

"The Moreno brothers, Delfino, Abel, and Isaac, had been promised $200 per person to transport 11 illegal immigrants from Arizona to California. The brothers left Arizona in two vehicles: Abel drove a white van with Isaac as a passenger along with seven illegal immigrants; Delfino drove a sport utility vehicle loaded with four illegal immigrants. They planned to arrive at Santa Ana in the early morning hours of April 24, 2001, and to meet at Delfino's apartment.

"Delfino arrived first and waited in the parking lot for Abel and Isaac. According to the prosecution's witnesses, as Abel pulled up, Perez, Nunez, and one other person got out of a white parked car and, armed with an AK-47 rifle, a shotgun, and a handgun, approached Abel's van. The three men surrounded the van and yelled at Abel to get out of his car. But Abel put the van in reverse and fled. Perez, Nunez, and the third person started shooting at the van. Perez was shooting with the assault rifle and Nunez with a handgun. Abel and Isaac escaped, although one of the van's side windows was shattered by a blast and Abel suffered cuts on his face and arms.

"Delfino was not so lucky. Again, according to the prosecution's witnesses, Perez pushed the AK-47 into Delfino's ribs and Nunez held a gun to Delfino's head, forcing him into the back seat of the waiting car. Two other persons were in the front seats. Perez and Nunez sat on either side of Delfino in the back seat. Perez took Delfino's cell phone away from him, and the car was driven over a series of freeways to Los Angeles. Upon leaving the freeway in Los Angeles, Delfino's face was covered with a black ski mask and he was taken to an abandoned apartment where defendants tied his hands and feet.

"Meanwhile, after making his escape, Abel called Delfino's wife and asked her to check on Delfino. She had just heard the shots, and when Abel called to tell her what had happened, she called 911. While on the phone with the dispatcher, she received another call on her call waiting service and the dispatcher instructed her to answer it. A male voice told her 'they had taken [Delfino].' When officers from the Santa Ana Police Department arrived at the apartment complex, she gave them Delfino's cell phone number. An officer called the number, spoke to a male in Spanish, and asked him where Delfino was. The person on the phone responded that Delfino was okay, and asked who was calling. The officer responded by identifying himself as a Santa Ana police officer. The person on the phone hung up, and subsequent calls were not answered.

*"The Ransom Demand and Negotiation*

"The police attached a listening device to Abel's cell phone to monitor any calls. Shortly after 3:00 o'clock that afternoon, Abel received a call from the kidnappers and they demanded $100,000 and a kilo of cocaine by sunrise the next morning in exchange for Delfino's return. Delfino got on the phone briefly, but only greeted Abel before the caller took the phone back. When the caller got back on the phone, Abel negotiated the ransom price—two kilos of cocaine and $50,000. An hour later, Abel received another call. This time, Delfino told Abel he was 'Okay,' and asked, 'Is everything okay there?' Abel asked the caller for more time to obtain the money because the banks were closed. After another series of phone calls, by late the next afternoon, Abel and the caller had agreed to meet at a Pavilions store in Long Beach to exchange Delfino for the ransom. The kidnappers told Abel they would be in a green Cherokee. But the exchange never took place. Delfino, who was driving around with the kidnappers while they were discussing where to meet with Abel, said Perez and Nunez left the Pavilions area because they said, 'there were narcos.'

*"The Chase*

"Sergeant Ruben Ibarra, Investigator Carol Salvatierra, Officer John Rodriguez, Investigator John Garcia, Officer Paul Hayes, and Investigator Dean Fulcher, all of the Santa Ana Police Department, assisted in the surveillance of the Pavilions parking lot. Ibarra was driving an unmarked Chevrolet Venture with Salvatierra as his partner. Ibarra was wearing shorts and a t-shirt, but he was also wearing a bullet-proof vest that had the word 'POLICE' inscribed across the front. Salvatierra was wearing a similar vest, but it was not marked with the word 'POLICE.' Rodriguez was driving a Chevrolet Astro Van with Garcia as his partner, and Hayes was driving a Dodge Intrepid with Fulcher as his partner.

"As Ibarra and Salvatierra were leaving the parking lot at the Pavilions store, Ibarra noticed an Oldsmobile traveling southbound on Woodruff Street. Ibarra turned and pulled into the lane next to the Oldsmobile. Ibarra's suspicion was aroused, even though he had been looking for a green Jeep, because the occupants of the Oldsmobile were looking around nervously, the driver was talking on a cell phone, the driver matched the description of one of the kidnappers, and the passenger in the back seat looked 'stiff' and was not looking around. Ibarra continued to follow the car through a residential area.

"Contacted by radio, Rodriguez, Garcia, Hayes and Fulcher joined the pursuit. The Oldsmobile eventually turned against traffic to get onto the southbound 405 freeway. The officers chased the Oldsmobile to the Seal Beach Boulevard exit where the Oldsmobile turned off the freeway. Near the end of the exit ramp, the Oldsmobile suddenly stopped. Ibarra stopped immediately behind it. Suddenly, three to six shots were fired from the Oldsmobile in the direction of Ibarra's car. The rear window on the passenger side of the Oldsmobile was blown out and Officer Rodriguez, who had stopped his car behind Ibarra, saw a muzzle flash coming from the passenger side of the Oldsmobile. The driver's window on Ibarra's vehicle was shattered. Delfino, who was sitting handcuffed in the back seat of the Oldsmobile, testified that Nunez was firing the assault rifle from the front passenger seat.

"The chase moved back to the northbound 405 freeway. Officer Hayes' vehicle became the lead. As the chase continued, a marked police car containing Officers Holderman and Saunders joined the chase near Palo Verde. As the Oldsmobile left the freeway at Woodruff, the marked police car became the lead vehicle. Its overhead red and blue lights were on and its siren was sounding. According to Delfino, at this point Perez told Nunez to shoot the police. At Los Coyotes Boulevard eight to 10 shots were fired from the passenger's side of the Oldsmobile at the marked police car. Numerous bullet holes were later found on the front hood, right door frame, right sideview mirror, and inside of the car including a bullet hole one foot from the location of Holderman's head and four to six inches from Saunders' head. Ibarra's vehicle, which had continued the chase after the first shooting, was also struck.

"The chase ended when the Oldsmobile crashed at the end of Los Coyotes on Carson. Nunez and Perez ran from the vehicle. Delfino was found sitting in the back of the car and appeared 'pretty shaken up.' His hands were handcuffed in front of him. An assault rifle and a handgun were recovered from the front passenger side of the Oldsmobile. Nunez and Perez were chased down and arrested. When Perez was arrested he had a Ruger nine-

millimeter handgun in his waistband and was carrying Delfino's cell phone. Perez's jacket was also recovered. A magazine for the nine-millimeter pistol was found inside the jacket.

*"Defense Evidence*

"Perez called Christian Eaton to testify he had observed Abel's van being chased by a person shooting a nine-millimeter handgun. As Abel's van sped away, Eaton testified he heard one shot fired from the driver's side of the van. Perez also called Delfino to testify that during his confinement in the apartment, Nunez kept a gun pointed at him.

"Nunez called his mother to testify he was at home with her on the nights of April 23rd and 24th, and was still at home when she woke up the mornings of April 24th and 25th. She also testified he was with her continuously from the time he woke up on April 25th until 5:00 p.m., when she dropped him off at his uncle's house.

"Nunez testified in his own defense. He said he was home with his mother at the time of the initial kidnapping. Nunez had never met Perez or Delfino before the kidnapping, but he had seen them around the neighborhood. After being dropped off at his uncle's house, Nunez went to a 'ditching' party with a friend. Delfino was at the party and so was Perez. Delfino was not in handcuffs. Delfino approached and asked Nunez if he wanted to make some money. Nunez agreed, so Delfino told Nunez he wanted him to pick up some money and drugs from Delfino's brothers and to act as if he [Delfino] had been kidnapped.

"Before the exchange took place, however, Delfino pointed out that a van was following them. The chase ensued. At the end of the off-ramp at Seal Beach Boulevard, Nunez fired the assault weapon at the following car because he 'was scared . . . that they're following us.' Nunez explained that the blast of the gun caused a ringing in his ears, and he could not hear very well after that. He professed neither to have seen the marked police car nor to have heard the siren. He shot the second time because he saw two vans following them and he thought they were 'gonna try and do something to us.' During the second shooting episode, his vision was impaired because the rear window was shattered, and he was shooting through the open hole in the window." (*Nunez I, supra,* G032462.)

B.  *Petitioner's Background and Lesser Culpability, According to His Habeas Corpus Petition*

Nuñez grew up in a dangerous South Central Los Angeles neighborhood where, according to his mother and father, as many as 10 people were shot

and killed nearby and the sound of gunshots was not uncommon. His mother would force her children to the floor for fear of shots hitting the house. Nuñez wanted his mother to flee the violence *in* the home. He witnessed weekly and sometimes nightly domestic violence inflicted by both parents on each other and his four siblings, including an incident at age eight where he intervened to protect his mother but his father threw him aside. Nuñez also regularly heard each parent threaten the other with death or violent injury and watched on one occasion as his mother feigned a heart attack to stop her husband's abuse. The police often responded to domestic violence calls at the home, some made by Nuñez. Nuñez became hysterical when his parents fought and often woke up crying with night terrors.

Nuñez was physically and verbally abused by his alcoholic father, who whipped the children with a belt, extension cords, and TV cables, leaving marks on their legs, arms, and buttocks. His mother and grandmother joined in beating him with a belt to correct his misbehavior and his older sister, to discipline him while babysitting, broke a broomstick with blows to his body. He performed poorly in school. The only school activity Nuñez's mother recalled participating in was his graduation from an elementary school Drug Abuse Resistance Education program. He was excited to have his photograph taken with the officer and wanted to be a policeman when he grew up.

Nuñez joined a criminal street gang at age 12, but was a member for less than a year. During that time, his participation in the gang consisted solely of associating with other members at parties and spraying graffiti.

In September 1999, 13-year-old Nuñez was shot multiple times in a random gangland shooting while riding his bicycle in the street near his home. His 14-year-old brother, José, heard him cry out and ran to his aid. The perpetrator shot José in the head, killing him. Nuñez suffered severe internal damage and bleeding from the gunshots to his abdomen. After his recovery, Nuñez left California and stopped associating with the gang, covered his tattoos, and became an obedient and helpful middle schooler while living with his aunt's family in Nevada.

California probation authorities, however, required Nuñez to return to Los Angeles.[3] Living just blocks from where he was shot and his brother was killed, Nuñez suffered trauma symptoms, including flashbacks, an urgent need to avoid the area, a heightened awareness of potential threats, and an intensified need to protect himself from real or perceived threats. He obtained a gun for self-defense and, shortly thereafter, was arrested for possessing the

---

[3] Nuñez was on probation following his adjudication as a ward of the court for a burglary offense.

weapon. Back in juvenile camp briefly, supervisors reported he eagerly participated in and positively responded to the structured environment and guidance of staff members. He was released two months before the present offense.

Three defense witnesses and two of the state's three eyewitnesses testified Nuñez was not present on April 24, 2001, when Delfino was abducted. Nuñez testified he met Delfino and 27-year-old Perez at a party the following day in the late afternoon of April 25, 2001. Delfino asked him to help extract some money from his brothers by pretending that he (Delfino) had been kidnapped. According to Nuñez, the jury's numerous requests for readback of testimony concerning the initial kidnapping suggest the jury did not convict him of participating in the initial abduction and conspiracy to commit kidnapping on April 24th, but only with respect to the events on the following day.

Nuñez acknowledged responsibility for his actions on April 25th, the day following Delfino's initial kidnapping. He testified he willingly entered the vehicle with Delfino and Perez to perpetrate the fake kidnapping, and admitted he knew there were two guns in the car. Perez drove as Delfino gave directions; Nuñez never had been in the area before. Delfino pointed out they were being pursued by a gray van with dark tinted windows, driven by a Hispanic man with a Hispanic passenger. The van followed them even as Perez exited and reentered the freeway. Nuñez fired his gun at the vehicle chasing them because he feared the occupants of the van would shoot him. The gun recoiled and hit him in the face, blurring his vision, and the loud report of the gun stunned and deafened him. The shot shattered the back window of the car, making it impossible to see through the glass.

Nuñez ducked down as Perez drove away. The van continued to follow them and soon a second van with two Hispanic male occupants joined the pursuit. Perez was going to stop the vehicle, but Delfino shouted at them "to keep on going and to keep on shooting." Nuñez again fired at his pursuers. Perez proceeded down Los Coyotes Diagonal, kicking up so much dust and debris that the police officers driving the pursuing vehicles testified they could not see inside the car. A marked police car joined the pursuit and was hit by bullets from Nuñez's gun. According to Nuñez, when he saw the police vehicle activate its lights, he dropped his gun to the floor and left it there. Seconds later, Perez slammed on the brakes and crashed into some trees.

In an attachment to his habeas corpus petition, petitioner included the declaration of a psychiatrist, Dr. Zakee Matthews. Based on several interviews he conducted with petitioner in March 2007, Matthews concluded petitioner suffered from posttraumatic stress disorder as a result of being shot

and witnessing his brother's slaying. Matthews explained that the condition could result in a heightened awareness of potential threats, coupled with a powerful impulse to protect oneself from real or perceived threats, particularly life-threatening ones.

Matthews opined that Nuñez's posttraumatic stress disorder, a "major mental illness[,] profoundly affected his behavior during the car chase." Matthews noted: "This offense occurred almost immediately after Antonio was sent home from camp . . . to the site of his shooting and his brother's death. The intense symptoms he re-experienced upon being forced to return to that neighborhood were exacerbated by the threats made on Antonio and his family and by his traumatized mother's hypervigilant behavior. She moved the entire family into a relative's spare bedroom and rarely let Antonio out of her sight for fear that he would be gunned down in the street. Antonio spent the period immediately prior to this offense in a near-constant state of high alert, from which he sought relief (numbing) by using alcohol and marijuana."

According to Matthews: "Viewed in the context of post-traumatic stress disorder, Antonio's behavior is most accurately described as impulsive and self-protective. His perception that the unknown persons pursuing him in the unmarked vans would hurt or kill him was informed by his trauma history of having been shot, his brother being shot and killed, his life being threatened, and seeing people shot and killed in his neighborhood. Antonio's awareness of potential threats heightened, but his need to protect himself in response to threats likewise was heightened. The intensity of Antonio's hyperarousal state was exacerbated when an adult confirmed that his life was in danger and ordered him to fire, and the pursuers continued to chase him."

Matthews concluded that "at the time of the offense," petitioner "lacked ability to control his impulses, comprehend the consequences of his actions, plan or make informed decisions, and was highly susceptible to the negative influences of people older than him." Additionally, "Mr. Nuñez's mental functioning and behavior was diminished beyond that typical of 14-year-old children by mental illness, namely post-traumatic stress disorder and major depression, as well as adverse developmental factors including early alcohol and drug use, neglect and abuse, and possible cognitive deficits."

In a general denial in his return, the Attorney General asserted "no knowledge of" petitioner's factual allegations concerning his history of posttraumatic stress disorder and domestic violence.

## II

## DISCUSSION

A. *Preliminary Issues*

■    The Attorney General contends petitioner's habeas corpus claim is not cognizable because it is untimely. Neither the Legislature nor the Supreme Court has established an express time limit within which a petitioner must seek habeas corpus relief. (*In re Huddleston* (1969) 71 Cal.2d 1031, 1034 [80 Cal.Rptr. 595, 458 P.2d 507].) Nor does the Attorney General identify any particular window of time pertinent to petitioner's federal claim. Rather, the general rule is that a petition must be filed "as promptly as the circumstances allow." (*In re Clark* (1993) 5 Cal.4th 750, 765, fn. 5 [21 Cal.Rptr.2d 509, 855 P.2d 729].) " ' "[A]ny significant delay in seeking collateral relief . . . must be fully justified. [Citations.]" [Citation.] . . .' " (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1221 [53 Cal.Rptr.3d 572].) Delay is measured from the time a petitioner knew, or reasonably should have known, the information in support of the claim *and the legal basis for the claim* (*In re Robbins* (1998) 18 Cal.4th 770, 780 [77 Cal.Rptr.2d 153, 959 P.2d 311] (*Robbins*)), beginning as early as the date of conviction (*In re Clark, supra*, 5 Cal.4th at p. 765, fn. 5).

The Supreme Court, in March 2005, denied review of our opinion affirming petitioner's conviction. In addition to four unanswered letters petitioner already had sent his appellate counsel before that date asking about the status of his appeal, petitioner sent counsel another inquiry postmarked August 22, 2006. Petitioner's appellate counsel, in a sworn statement attached to the present petition, admitted "it is *likely* that Mr. Nuñez did not receive notice of the California Supreme Court's denial of his petition for review." (Italics added.) We infer from this statement either that petitioner's former appellate counsel failed to notify petitioner of the Supreme Court's denial of review, or that notice was not transmitted to petitioner. There is no reason to suppose petitioner personally knew of a legal basis for asserting his present claims until he was contacted by the Equal Justice Initiative (EJI) in October 2006, well after the Supreme Court denied review. We do not consider the six months between October 2006 and April 2007, when EJI filed this petition on petitioner's behalf, to constitute a significant delay, particularly where the Attorney General attributes no prejudice to that period or, indeed, to the timeliness of the petition generally. We therefore conclude petitioner's request for habeas corpus relief is not barred for untimeliness.

The Attorney General next contends petitioner has forfeited his claim because appellate counsel, familiar with petitioner's youth and presumably

familiar with the state and federal Constitutions, knew or should have known of the legal basis on which petitioner now seeks habeas corpus relief. (See *Robbins, supra*, 18 Cal.4th at p. 780.) But when "the question raised in a petition for writ of habeas corpus 'is one of excessive punishment, it is a proper matter for us to consider on a writ of habeas corpus, despite [the petitioner's] delay.' " (*People v. Miller* (1992) 6 Cal.App.4th 873, 877 [8 Cal.Rptr.2d 193].)

Finally, the Attorney General asserts the petition fails to establish the requisite prima facie case to avoid summary denial. But the Attorney General overlooks that the Supreme Court, in issuing the order to show cause, already has determined that petitioner met his prima facie burden. (*People v. Duvall* (1995) 9 Cal.4th 464, 475 [37 Cal.Rptr.2d 259, 886 P.2d 1252] (*Duvall*); see also Cal. Rules of Court, rule 4.551(c)(3) ["An order to show cause is a determination that the petitioner has made a showing that he or she may be entitled to relief."].)

■ Moreover, with respect to petitioner's claim of posttraumatic stress disorder, which the Attorney General denies generally, we note the Supreme Court's "disapproval of the practice of filing returns that merely contain a general denial of a habeas corpus petitioner's factual allegations." (*Duvall, supra*, 9 Cal.4th at pp. 480–481.) "It is the duty of the party who is ordered to show cause to present all its evidence . . . at the time it makes its return . . . ." (*In re Nesper* (1990) 217 Cal.App.3d 872, 876 [266 Cal.Rptr. 113], abrogated on another ground in *People v. Jack* (1997) 60 Cal.App.4th 1129, 1133 [70 Cal.Rptr.2d 676].) Where the respondent alleges only a conclusory statement of fact or law in the return, the respondent indicates a willingness to rely on the trial record and the documentary evidence submitted by the petitioner as exhibits to his petition. (*Duvall*, at p. 476.) Accordingly, we find it unnecessary to order a hearing to evaluate petitioner's medical claims, and instead turn immediately to the merits of his constitutional claims.

## B. *Petitioner's LWOP Sentence Violates Article I, Section 17*

■ Article I, section 17 of our Constitution proscribes "cruel or unusual punishment." Our Supreme Court has explained that, just as "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man" (*Trop v. Dulles* (1958) 356 U.S. 86, 100 [2 L.Ed.2d 630, 78 S.Ct. 590] (*Trop*)), under our constitutional analogue, "the state must exercise its power to prescribe penalties within the limits of civilized standards and must treat its members with respect for their intrinsic worth as human beings: 'Punishment which is so excessive as to transgress those limits and deny that worth cannot be tolerated.' [Citation.]" (*People v. Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*).) A prison sentence runs afoul of

article I, section 17, if it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch, supra*, 8 Cal.3d at p. 424 [reversing life term for second indecent exposure conviction].)

■ A petitioner attacking his sentence as cruel or unusual must demonstrate his punishment is disproportionate in light of (1) the nature of the offense and the defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions. (*Lynch, supra*, 8 Cal.3d at pp. 425, 431, 436.) The petitioner need not establish all three factors—one may be sufficient (see *Dillon, supra*, 34 Cal.3d at p. 487, fn. 38), but the petitioner nevertheless must overcome a "considerable burden" to show the sentence is disproportionate to his level of culpability (*People v. Wingo* (1975) 14 Cal.3d 169, 174 [121 Cal.Rptr. 97, 534 P.2d 1001]). As a result, "[f]indings of disproportionality have occurred with exquisite rarity in the case law." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 [2 Cal.Rptr.2d 714].) Applying the factors enumerated in *Lynch*, we conclude this case is among the rarest of the rare in which the punishment imposed violates article I, section 17 of the California Constitution.

Petitioner contends an LWOP sentence imposed on offenders his age for kidnapping for ransom (§ 209, subd. (a)) that does not result in the victim's death or injury violates article I, section 17, for society's most youthful offenders generally and as applied to him in particular.[4] We agree.

1. *LWOP Under Section 209, Subdivision (a) Is Void for Offenders Younger than 16*

We evaluate petitioner's general challenge first, utilizing the *Lynch* factors. The first factor requires us to examine both the "the nature of the offense" and of "the offender," with "particular regard to the degree of danger both present to society." (*Lynch, supra*, 8 Cal.3d at p. 425.) We recognize that "when it is viewed in the abstract" (*Dillon, supra*, 34 Cal.3d at p. 479), even *simple* kidnapping—quite apart from the aggravated nature of petitioner's crime—presents a grave risk of danger. (See *In re Earley* (1975) 14 Cal.3d

---

[4] Section 209, subdivision (a), provides as follows: "*Any person who* seizes, confines, inveigles, entices, decoys, abducts, conceals, *kidnaps or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for ransom*, reward or to commit extortion or to exact from another person any money or valuable thing, or any person who aids or abets any such act, *is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for life without possibility of parole in cases in which any person subjected to any such act* suffers death or bodily harm, or *is intentionally confined in a manner which exposes that person to a substantial likelihood of death*, or shall be punished by imprisonment in the state prison for life with the possibility of parole in cases where no such person suffers death or bodily harm." (Italics added.)

122, 132 [120 Cal.Rptr. 881, 534 P.2d 721] ["asportation gave rise to dangers, not inherent in robbery, that an auto accident might occur or that the victim might attempt to escape from the moving car or be pushed therefrom . . ."].) A demand for ransom, as here, aggravates the crime because protracted confinement and the forcible control necessary to maintain it dramatically increase the danger to the victim. (See *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1228 [277 Cal.Rptr. 382] (*Ordonez*).) Petitioner exacerbated an already high level of danger by discharging his firearm repeatedly, jeopardizing not only his victim's life but the lives of motorists and pursuing peace officers.

In *Dillon*, the Supreme Court observed generally that the nature of a crime subject to the felony-murder rule "presents a very high level of . . . danger, second only to deliberate and premeditated murder with malice afore-thought." (*Dillon, supra*, 34 Cal.3d at p. 479.) The danger inherent in the nature of petitioner's actions here indisputably rises to the level of danger the felony-murder rule is designed to combat. (See *Ordonez, supra*, 226 Cal.App.3d at p. 1228 [kidnapping for ransom supports a conviction for felony murder because the offense "is inherently dangerous to human life"].) As the Attorney General observes, it is fortuitous that no one died or was injured as a result of petitioner's conduct.

■ But as *Dillon* teaches, the consequences of the defendant's actions inform the nature of the offense and are important in assessing the constitutional penalty the state may impose. (*Dillon, supra*, 34 Cal.3d at p. 479.) The nature of petitioner's offense, in which the victim and others were "expose[d] . . . to a substantial likelihood of death" (§ 209, subd. (a)), but no one was killed or injured, is more akin to attempted rather than completed murder. Lesser prescribed punishment for attempted crimes than completed ones, including murder (compare § 664, subd. (a) with § 190, subd. (a)), embody a core principle of justice that, simply put, consequences matter in apportioning punishment. As our Supreme Court recognized in *Lynch*, " '[T]here are rational gradations of culpability that can be made on the basis of injury to the victim.' " (*Lynch, supra*, 8 Cal.3d at p. 426.)

■ Age also matters. As part of the "nature of the offender" prong of our analysis, *Dillon* instructs that the perpetrator's age is an important factor in assessing whether a severe punishment falls within constitutional bounds. (*Dillon, supra*, 34 Cal.3d at p. 479.) Youth is generally relevant to culpability (*ibid.*; cf. Cal. Rules of Court, rule 4.413(c)(2)(C)), and the diminished "degree of danger" (*Lynch, supra*, 8 Cal.3d at p. 425) a youth may present after years of incarceration has constitutional implications (see *In re Barker* (2007) 151 Cal.App.4th 346, 375 [59 Cal.Rptr.3d 746] (*Barker*)).

In *Barker*, the court "agreed with the observations of the federal district court in *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F.Supp.2d 1063, that

' "the general unreliability of predicting violence is exacerbated in [a] case by . . . petitioner's young age at the time of the offense [and] the passage [in that case] of nearly twenty years since that offense was committed . . . ." ' [Citation.]" (*Barker, supra,* 151 Cal.App.4th at p. 376.) Relying on Supreme Court precedent, *Barker* noted that " ' "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." [Citations.] . . .' " (*Id.* at pp. 376–377, quoting *Johnson v. Texas* (1993) 509 U.S. 350, 368 [125 L.Ed.2d 290, 113 S.Ct. 2658].)

These observations, while made in the context of due process considerations pertinent to a parole decision (*Barker, supra,* 151 Cal.App.4th at p. 375), apply a fortiori to evaluating whether, under article I, section 17, a categorical no-parole LWOP sentence is disproportional to the "degree of danger" a youthful offender poses, as evidenced by the nature of the offender and his or her offense. (*Lynch, supra,* 8 Cal.3d at p. 425.) We conclude youth so striking as petitioner's and the absence of injury or death to any victim raise a strong inference that imposition of an LWOP sentence for a kidnapping offense under section 209, subdivision (a), violates article I, section 17. The inference becomes inescapable under *Lynch*'s second prong.

*Lynch*'s second prong compares the challenged penalty with the punishment in California for more serious crimes. (*Lynch, supra,* 8 Cal.3d at p. 431.) As noted, premeditated first degree murder (§ 189) is the most serious offense known to the law (*Dillon, supra,* 34 Cal.3d at p. 479). Section 190 makes first degree murder punishable by death, LWOP, or 25 years to life in prison. Section 190.5, subdivision (a), provides, however, that the death penalty may not be imposed on a person younger than 18 years old at the time he or she committed the crime. And, as petitioner points out, section 190.5, subdivision (b), limits the availability of LWOP as a sentencing option—even for special circumstance murders committed during a kidnapping (§ 190.2, subd. (a)(17)(B))—to offenders 16 years of age or older at the time of the offense.[5] Consequently, of the penalties prescribed in section 190, i.e., death, LWOP, or a life term with the possibility of parole, only the last is potentially available for a 14-year-old juvenile convicted of first degree murder, even with special circumstances. (*People v. Demirdjian* (2006) 144 Cal.App.4th 10, 17 [50 Cal.Rptr.3d 184] (*Demirdjian*) ["For juveniles under 16 who were 14 or 15 when the crime was committed, a life term without

---

[5] Section 190.5, subdivision (b), provides: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

possibility of parole is not permitted, leaving a term of 25 years to life *with* possibility of parole."]; see Welf. & Inst. Code, § 602 [14 is the youngest age the state may prosecute a juvenile as an adult].)

These gradations in punishment according to age, applicable even to the most heinous acts (see §§ 190.2 & 190.25 [listing special circumstance murders]), reflect a determination that, as the United States Supreme Court observed recently in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183] (*Roper*), "juvenile offenders cannot with reliability be classified among the worst offenders." (*Id.* at p. 569.) In holding the death penalty unconstitutional for perpetrators younger than 18, the court focused on "[t]hree general differences" between juveniles and adults. (*Ibid.*) First, juveniles lack maturity and responsibility and are more reckless than adults. Second, juveniles are more vulnerable to outside influences because they have less control over their surroundings. And third, a juvenile's character is not as fully formed as that of an adult.[6]

The court concluded in *Roper*: "These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. [Citation.] The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." (*Roper, supra*, 543 U.S. at p. 570.)

---

[6] The *Roper* majority articulated the differences as follows: "First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.] It has been noted that 'adolescents are overrepresented statistically in virtually every category of reckless behavior.' [Citation.] In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent. [Citation.] [¶] The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.] This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. [Citation.] [¶] The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation.]" (*Roper, supra*, 543 U.S. at pp. 569–570.)

Before *Roper,* in *Thompson v. Oklahoma* (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687] (*Thompson*), the Supreme Court invalidated capital punishment for juveniles younger than age 16 sentenced under statutory schemes specifying "no minimum age at which the commission of a capital crime can lead to the offender's execution." (*Id.* at pp. 857–858 (conc. opn. of O'Connor, J.).) Section 209, subdivision (a), specifies no minimum age for imposition of an LWOP sentence. Noteworthy here, the plurality in *Thompson,* relying on earlier Supreme Court precedent, observed: " ' "[A]dolescents, *particularly in the early and middle teen years,* are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. . . ." ' " (*Thompson,* at p. 834, italics added.) Additionally: " 'Our history is replete with laws and judicial recognition that minors, *especially in their earlier years,* generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence,* minors often lack the experience, perspective, and judgment" expected of adults. [Citation.]' [Citation.]" (*Ibid.,* italics added.)

Recent psychosocial research bears out the judicial observations collected in *Thompson* concerning very young offenders. (See Cauffman & Steinberg, *Maturity of Judgment in Adolescence: Why Adolescents May Be Less Culpable than Adults* (2000) 18 Behav. Sci. & L. 741, 756 ["the steepest inflection point in the development curve occurs sometime between [age] 16 and 19 years"]; Halpern-Felsher & Cauffman, *Costs and Benefits of a Decision: Decision-Making Competence in Adolescents and Adults* (2001) 22 J. Applied Developmental Psychol. 257 [noting important differences in decisionmaking competence of early adolescents in contrast with older teenagers].) Consistent with these authorities and with *Roper* and *Thompson,* our Supreme Court has long identified youth as a factor mitigating the defendant's culpability. (See, e.g., *Dillon, supra,* 34 Cal.3d at p. 479 [reversing 17 year old's life sentence for robbery murder].)

Against this backdrop, and in marked contrast to section 190.5, the Penal Code provision under which the trial court imposed the LWOP sentence on petitioner—section 209, subdivision (a)—makes no allowance for the age of the offender. The statute instead provides that anyone who commits a kidnapping "expos[ing]" the victim to a "substantial likelihood" of death "shall be punished by imprisonment in the state prison for life without possibility of parole . . . ." (*Ibid.*) In other words, the state's sentencing scheme makes a perverse distinction between juvenile offenders under 16 years old, providing for harsher punishment for those who do not harm a victim kidnapped for ransom than for those who commit murder with special circumstances. (Compare §§ 190, 190.5, and *Demirdjian, supra,* 144

Cal.App.4th at p. 17 [maximum penalty for murder for juveniles under 16 is life with parole] with § 209, subd. (a) [LWOP for aggravated kidnapping]; see *Dillon, supra*, 34 Cal.3d at p. 487, fn. 38, original italics [intrajurisdictional comparison "is particularly striking when a more serious crime is punished *less* severely than the offense in question"].)

■ *Lynch* explained the rationale for intrajurisdictional comparison of crimes arises from the fact "the Legislature may be depended upon to act with due and deliberate regard for constitutional restraints in prescribing the vast majority of punishments set forth in our statutes." (*Lynch, supra*, 8 Cal.3d at p. 426; see Cal. Const., art. XX, § 3 [members of Legislature sworn to uphold both the state and federal Constitutions]; Evid. Code, § 664 [official duty presumed performed].) The sanctions settled upon by the Legislature "may therefore be deemed illustrative of constitutionally permissible degrees of severity; and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect." (*Lynch, supra*, 8 Cal.3d at p. 426.)

■ Given the stark difference between murdering a victim and a kidnapping offense where the victim is unharmed, the imposition of greater punishment for kidnapping can only be described as arbitrary and grossly disproportionate. We conclude a statutory regime that punishes the youngest juvenile offenders more harshly for kidnapping than for murder is not merely suspect, but shocks the conscience and violates human dignity. " '[T]his contrast shows more than different exercises of legislative judgment. It is greater than that. It condemns the sentence in this case as cruel and unusual. It exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice.' [Citation.]" (*Lynch, supra*, 8 Cal.3d at p. 437, quoting *Weems v. United States* (1910) 217 U.S. 349, 381 [54 L.Ed. 793, 30 S.Ct. 544].)

■ Such a sentence serves no valid penological purpose. Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence. (See 1 LaFave, Substantive Criminal Law (2d ed. 2003) § 1.5, pp. 37–43.) But, as noted, the Legislature's purported judgment that petitioner's offense warrants greater retribution than for murder of the kidnapping victim is strikingly disproportionate. As a matter of logic, the limiting principle of constitutional proportionality applies not only to retribution, but to incapacitation and deterrence. Incapacitating petitioner far longer than a murderer defies logic. Consequently, permanent incapacitation here results in a grossly disproportionate sentence, considering the "degree of danger" (*Lynch, supra*, 8 Cal.3d at p. 425) posed by a 14-year-old youth committing a no-injury offense. And the absence, in the LWOP context, of any rehabilitative outcome demonstrates that any potential deterrent effect, already doubtful for offenders

so young (*Roper, supra,* 543 U.S. at pp. 569–570; *Thompson, supra,* 487 U.S. at p. 843) is outweighed by constitutional considerations. True, the state conceivably may obtain an increased deterrent effect from grossly disproportionate punishment. But in exceeding any measured relation to culpability, such deterrence is achieved by utilizing the person solely as an object, inconsistent with his or her human dignity. (See *Dillon, supra,* 34 Cal.3d at p. 478 [the "basic concept" underlying both the federal and state cruel and/or unusual clauses "is nothing less than the dignity of man"]; accord, *Trop, supra,* 356 U.S. at p. 100; see, e.g., Dressler, *Substantive Criminal Law Through the Looking Glass of Rummel v. Estelle: Proportionality and Justice As Endangered Doctrines* (1981) 34 Sw. L.J. 1063, 1077 ["The process of punishment occurs not just because it may be good for society but because it is fair to the person."]; see also McCloskey, *A Non-Utilitarian Approach to Punishment,* in Philosophical Perspectives on Punishment (Ezorsky edit., 1972) 119, 121–122 ["It is logically possible to say that the punishment was useful but undeserved, and deserved but not useful. It is not possible to say that the punishment was just although undeserved."].) ▮ Accordingly, we hold section 209, subdivision (a), violates article I, section 17 of the California Constitution to the extent it purports to punish a juvenile kidnapper under age 16 more severely than if he or she had murdered the victim.[7]

### 2. *Petitioner's As-applied Challenge*

In *Lynch,* the Supreme Court found the statute prescribing a life sentence for second-offense indecent exposure facially void under California's cruel or unusual punishment prohibition (*Lynch, supra,* 8 Cal.3d at p. 439), but also as applied to the particular offender. The court concluded, "Not only does the punishment here fail to fit the crime, it does not fit the criminal." (*Id.* at p. 437.) The same is true here for the LWOP sentence imposed on petitioner under section 209, subdivision (a).

▮ In analyzing an as-applied challenge, we must consider the nature of the offense and the offender "in the concrete rather than the abstract." (*Dillon, supra,* 34 Cal.3d at p. 479.) *Dillon* instructs that "the defendant's individual culpability [i]s shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*) The circumstances of the defendant's particular offense, "including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts," also mark an objective relation between culpability and punishment. (*Ibid.*)

---

[7] As in *Dillon,* we need not reach the third prong under *Lynch*—"a comparison of the challenged penalty with those prescribed for the same offense in other jurisdictions—in order to complete our analysis." (*Dillon, supra,* 34 Cal.3d at p. 487, fn. 38.) It is sufficient, under the first and second prongs, that "the punishment 'shocks the conscience and offends fundamental notions of human dignity.' [Citation.]" (*Ibid.*)

We already have determined petitioner's age and the no-injury consequences of his offense strongly support an inference the imposition of an LWOP sentence violates article I, section 17. The evidence does not support, however, petitioner's suggestion he acted without significant culpability because of the influence of his older coperpetrator, Perez, or his older victim, Delfino, who petitioner claims commanded him to fire at their pursuers. While youth are undoubtedly influenced by, and perhaps even subjected to some control by, their elder peers (see *Roper, supra,* 543 U.S. at p. 569), it is impossible to overlook that petitioner fired his weapon not just once, but between 11 and 18 times in at least two different volleys separated by an interval of several minutes. It was too much for the jury, or any rational observer, to accept that Perez's or Delfino's asserted Svengali-like control included a shot from the front passenger seat that traveled inside the car to blow out the rear window of the vehicle, not far from Delfino. The circumstances of the offense, in which petitioner's involvement as the triggerman in the exceedingly violent way the offense exposed Delfino (and others) to "a substantial likelihood of death" (§ 209, subd. (a)), together with the reprehensible, danger-enhancing ransom motive, see *ante,* dilute to some degree any constitutional presumption against an LWOP sentence arising from petitioner's extreme youth and the absence of any injury from his actions.

But in addition to the foregoing factors, *Dillon* also requires consideration of petitioner's personal characteristics (*Dillon, supra,* 34 Cal.3d at p. 479), which included a slender history of criminality and, as in *Dillon,* compelling evidence of a vulnerable and defensive state of mind, here precipitated by evidence petitioner suffered from posttraumatic stress disorder, resulting from the tragic circumstances of his brother's death.

In *Dillon,* the Supreme Court found the life sentence required for felony murder excessive under article I, section 17, as applied to a 17-year-old defendant. The jury and the trial court concluded the defendant's culpability warranted a conviction and punishment less harsh than mandated by the "Procrustean" felony-murder rule. (*Dillon, supra,* 34 Cal.3d at pp. 477, 484–487.) The Supreme Court observed, "The record fully supports the triers' conclusion. It shows that at the time of the events herein defendant was an unusually immature youth. He had had no prior trouble with the law, and, as in *Lynch* and [*In re Reed* (1983) 33 Cal.3d 914 [191 Cal.Rptr. 658, 663 P.2d 216]], was not the prototype of a hardened criminal who poses a grave threat to society." (*Dillon, supra,* 34 Cal.3d at p. 488.) In reducing the defendant's conviction to second degree murder, the court explained: "The shooting in this case was a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger. To be sure, he largely brought the situation on himself, and with hindsight his response might appear unreasonable; but there is ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Ibid.*; see

*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1279 [67 Cal.Rptr.2d 596] [noting defendant's state of mind as the "principal[]" factor under *Dillon*].)

Here, the unrebutted evidence of petitioner's compromised state of mind, activated by the posttraumatic stress disorder he suffered from his and his brother's shooting, throws the disproportionate harshness of his sentence in sharp relief. The unrebutted expert testimony established that petitioner's posttraumatic stress disorder, a "major mental illness[,] profoundly affected his behavior during the car chase." As Matthews noted, "This offense occurred almost immediately after Antonio was sent home from camp . . . to the site of his shooting and his brother's death. The intense symptoms he re-experienced upon being forced to return to that neighborhood were exacerbated by the threats made on Antonio and his family and by his traumatized mother's hypervigilant behavior." As Matthews explained, without contradiction: "Viewed in the context of post-traumatic stress disorder, Antonio's behavior is most accurately described as impulsive and self-protective. His perception that the unknown persons pursuing him in the unmarked vans would hurt or kill him was informed by his trauma history of having been shot, his brother being shot and killed, his life being threatened, and seeing people shot and killed in his neighborhood. Antonio's awareness of potential threats heightened, but his need to protect himself in response to threats likewise was heightened."

While it is true that, as with the defendant in *Dillon*, petitioner " 'trapped' " himself " 'in a situation of [his] own making' " (*Dillon, supra,* 34 Cal.3d at p. 486), the evidence also showed a mental state reducing petitioner's culpability. Most notably, the unrebutted evidence established "Nuñez's mental functioning and behavior was diminished *beyond* that typical of 14-year-old children by mental illness, namely post-traumatic stress disorder and major depression . . . ." (Italics added.) But the state, in imposing an LWOP sentence, has judged him irredeemable while at the same time extending hope of rehabilitation and parole to all juvenile kidnappers, including those significantly older than petitioner, who murder their victims. This anomaly violates article I, section 17 of the California Constitution. (See *Dillon, supra,* 34 Cal.3d at p. 478 ["a punishment may violate the California constitutional prohibition 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity' "].) We therefore vacate, on independent state constitutional grounds, petitioner's LWOP sentence under section 209, subdivision (a), as applied to him.

## C. *Petitioner's LWOP Sentence Violates the Eighth Amendment*

The Eighth Amendment declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The

clause "prohibits not only barbaric punishments" (*Solem v. Helm* (1983) 463 U.S. 277, 284 [77 L.Ed.2d 637, 103 S.Ct. 3001] (*Solem*)) but also "encompasses a narrow proportionality principle" (*Harmelin v. Michigan* (1991) 501 U.S. 957, 997 [115 L.Ed.2d 836, 111 S.Ct. 2680] (*Harmelin*) (conc. opn. of Kennedy, J.)) "applicable to sentences for terms of years" (*Lockyer v. Andrade* (2003) 538 U.S. 63, 72 [155 L.Ed.2d 144, 123 S.Ct. 1166] (*Lockyer*); accord, *Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 123 S.Ct. 1179] (*Ewing*); *Solem*, at p. 284).

In *Solem*, the Supreme Court held imposition of an LWOP sentence on an adult offender "grossly disproportionate" (*Solem, supra*, 463 U.S. at p. 288) to the defendant's "crime of recidivism" (*Harmelin, supra*, 501 U.S. at p. 998 (conc. opn. of Kennedy, J.)), which was predicated on a current offense of "uttering a 'no account' check for $100" and the defendant's lengthy criminal history that included seven nonviolent felonies (*Solem*, at pp. 279–281). Echoing the trinity of factors articulated in *Lynch*, *Solem* counseled that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem*, at p. 292.) *Solem* observed that "no one factor will be dispositive in a given case." (*Id.* at p. 291, fn. 17.)

In *Harmelin*, noting that *Solem* stated "it *may* be helpful to compare the sentences imposed on other criminals in the same jurisdiction" (*Solem, supra*, 463 U.S. at p. 291, italics added) and that "courts *may* find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions" (*ibid.*, italics added), Justice Kennedy concluded in his concurrence that *Solem* "did not mandate such inquiries." (*Harmelin, supra*, 501 U.S. at p. 1005 (conc. opn. of Kennedy, J.).) Rather, "[a] better reading of our cases leads to the conclusion that intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." (*Harmelin*, at p. 1005.) The facts in *Harmelin* did not rise to that level.

There, Justice Kennedy joined four other justices to hold that an LWOP sentence imposed on an adult offender for possessing 1.5 pounds of cocaine, sufficient to yield between 32,500 and 65,000 doses, did not violate the Eighth Amendment. Based on the pernicious connection between massive drug quantities and crime, Justice Kennedy explained that the court rejected the defendant's assertion his possession was "nonviolent and victimless," as follows: "[A] rational basis exists for Michigan to conclude that petitioner's

crime is as serious and violent as the crime of felony murder without specific intent to kill, a crime for which 'no sentence of imprisonment would be disproportionate . . .' [citations]." (*Harmelin, supra*, 501 U.S. at pp. 1002, 1004 (conc. opn. of Kennedy, J.); see also *Rummel v. Estelle* (1980) 445 U.S. 263, 295, fn. 12 [63 L.Ed.2d 382, 100 S.Ct. 1133] (dis. opn. of Powell, J.) ["A professional seller of addictive drugs may inflict greater bodily harm upon members of society than the person who commits a single assault."].)

The Attorney General argues *Solem*'s three-part test is no longer good law because it "did not retain the support of a majority of the Supreme Court in *Harmelin*." Since *Harmelin*, however, the court has expressly reaffirmed *Solem* (*Lockyer, supra*, 538 U.S. at p. 74) and recounted, without overruling, the relevance of its three prongs (*Ewing, supra*, 538 U.S. at p. 22).

Even assuming, however, under Justice Kennedy's analysis in *Harmelin* that a threshold inference of gross disproportionality must arise under the first prong of *Solem* before reaching the other two, the unique facts here place this case in the rare category satisfying that standard. While the gravity of petitioner's offense is, as discussed *ante*, second only to the seriousness of first degree premeditated murder, we also must recognize the sentence is the harshest the state may impose on teenage offenders almost four years older than petitioner (*Roper, supra*, 543 U.S. 551). Petitioner's youth is relevant because the harshness of the penalty must be evaluated in relation to the particular characteristics of the offender. (*Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] [death sentence disproportionate where defendant harbored no intent to kill]; accord, *Solem, supra*, 463 U.S. at pp. 292, 296–297 [finding, in applying proportionality principle to term of years, the "culpability of the offender," although a recidivist, diminished where prior offenses "were all relatively minor"].) And, in light of *Roper* and *Thompson*, as discussed *ante*, the harshness of the penalty warrants scrutiny because of the relation between age and culpability.

As Justice Kennedy has observed, the "type of punishment imposed" is the "most prominent objective factor" a court evaluates in its proportionality review. (*Harmelin, supra*, 501 U.S. at p. 1000 (conc. opn. of Kennedy, J.).) On that score, an LWOP sentence is the harshest possible punishment for a juvenile offender, particularly a juvenile under age 16. "[L]ife without parole for a juvenile, like death, is a sentence different in quality and character from a sentence to a term of years subject to parole." (*Hampton v. Com.* (Ky. 1984) 666 S.W.2d 737, 741.) Stated differently by our Supreme Court, the harshness of an LWOP is particularly evident "if the person on whom it is inflicted is a minor, who is condemned to live virtually his entire life in ignominious confinement, stripped of any opportunity or motive to redeem himself for an act attributable to the rash and immature

judgment of youth." (*People v. Davis* (1981) 29 Cal.3d 814, 832, fn. 10 [176 Cal.Rptr. 521, 633 P.2d 186]; see also *Naovarath v. Nevada* (1989) 105 Nev. 525 [779 P.2d 944, 944] [holding LWOP disproportionate for a 13 year old as a "denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the defendant], he will remain in prison for the rest of his days"].)

We conclude petitioner's youth, in conjunction with other factors, supports an inference under the first prong of *Solem* that his sentence of life in prison without parole violates the Eighth Amendment's proportionality requirement. Among those other factors, petitioner introduced unrebutted evidence he suffered from posttraumatic stress disorder at the time of the crime, as a result of witnessing his brother's slaying 19 months earlier. (Cf. *Atkins v. Virginia* (2002) 536 U.S. 304 [153 L.Ed.2d 335, 122 S.Ct. 2242] [mental disability so mitigates culpability for adult offenders as to preclude death penalty].) Although he "brought the situation on himself" (*Dillon, supra*, 34 Cal.3d at p. 488), the exigency of the vehicle chase colors, for an immature youth, "[t]he shooting in this case [as] a response to a suddenly developing situation that defendant perceived as putting his life in immediate danger." (*Ibid.*) We also cannot ignore that petitioner's coperpetrator was almost twice his age. (See *Thompson* and *Roper* [noting susceptibility of youth to pressure by others, especially elders].) Petitioner's extreme youth and compromised mental state support a conclusion he did not warrant the harshest penalty as one who neither fully grasped "the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." (*Dillon, supra*, 34 Cal.3d at p. 488.)

██ Also, because the consequences of a petitioner's actions reflect on his or her culpability and, in turn, serve as some measure for the harshness of the sentence imposed (see *Solem, supra*, 463 U.S. at p. 293 ["It also is generally recognized that attempts are less serious than completed crimes."], citing 4 Blackstone, Commentaries 15), we must recognize that no injuries resulted from his crime. (Cf. *People v. Em* (2009) 171 Cal.App.4th 964, 976 [90 Cal.Rptr.3d 264] [observing "the defendant's age matters," but "[i]t is also manifestly true, however, that murder matters"; upholding against federal and state constitutional challenges two consecutive 25 year-to-life terms for a nearly 16-year-old murder defendant].)

Finally, unlike the adult offenders in *Lockyer* and *Ewing*, petitioner did not have a history of violent crime. Before his brother's murder, petitioner had been adjudicated a ward of the court for committing burglary. He soon returned to juvenile camp for possessing a concealed weapon, but his arrest on that charge, let alone a conviction (*In re Frank S.* (2006) 141 Cal.App.4th

1192, 1199–1200 [46 Cal.Rptr.3d 839]), is insufficient evidence the possession was gang related rather than for self-defense. Similarly, petitioner's other *arrests* for nonviolent offenses that were never adjudicated, such as possessing stolen property and drug possession, do not trigger recidivist treatment. In sum, together with his youth, the foregoing factors support an inference under the first prong of *Solem* that petitioner's LWOP sentence contravenes the Eighth Amendment's proportionality requirement.

■■■■ Courts turn to intrajurisdictional and interjurisdictional comparisons under *Solem*'s second and third prongs in their Eighth Amendment analysis because the cruel and unusual punishment clause "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." (*Trop, supra,* 356 U.S. at p. 101.) In discerning those standards, laws enacted by legislatures across the nation provide the "clearest and most reliable objective evidence of contemporary values." (*Penry v. Lynaugh* (1989) 492 U.S. 302, 331 [106 L.Ed.2d 256, 109 S.Ct. 2934] (*Penry*).) Additionally, data reflecting sentencing outcomes, where available, can also afford " 'a significant and reliable objective index' " of societal mores.[8] (*Coker, supra,* 433 U.S. at p. 596 (plur. opn.), quoting *Gregg v. Georgia* (1976) 428 U.S. 153, 181 [49 L.Ed.2d 859, 96 S.Ct. 2909] (joint opn. of Stewart, Powell & Stevens, JJ.).)

On the second, intrajurisdictional, prong of *Solem*, petitioner points out that, besides the crime of kidnapping for ransom that exposes the victim to a substantial likelihood of death (§ 209, subd. (a)), the only other offenses short of homicide that California punishes by life in prison without parole are kidnapping for ransom *with* bodily injury (*ibid.*) and attempted train wrecking (§ 218). As noted, for offenders who murder their victims, California law restricts the availability of an LWOP sentence to persons 16 years old or older. (*Demirdjian, supra,* 144 Cal.App.4th at p. 17.) Although a murderer under age 16 therefore may receive a maximum sentence of life with parole (*ibid.*), which contrasts sharply with petitioner's harsher sentence, petitioner fails to provide objective data to ascertain whether his sentence violates the federal Constitution's "narrow" proportionality principle. (*Harmelin, supra,* 501 U.S. at p. 996 (conc. opn. of Kennedy, J.).) Such data would illustrate whether California is uncharacteristically severe in punishing aggravated kidnapping, whether for offenders generally or for minors under age 16.

---

[8] We cannot help but observe *Harmelin*'s threshold test excludes relevant evidence (Evid. Code, § 351; e.g., *Penry, supra,* 492 U.S. 302; *Coker v. Georgia* (1977) 433 U.S. 584 [53 L.Ed.2d 982, 97 S.Ct. 2861] (*Coker*); Cal. Const., art. XX, § 3) in the judicial determination of contemporary standards of decency required by the Eighth Amendment. Here, this proves to be of no moment, given we have concluded the threshold test is met.

In other words, on the third prong under *Solem*, petitioner fails to specify whether other states have eliminated or restricted LWOP for nonhomicide offenses under their penal schemes generally, or for juveniles. Indeed, petitioner provides no citations at all on the penalties that other state legislatures prescribe for his offense. Consequently, petitioner's showing is inadequate to determine where California's Penal Code lies on a national continuum in this matter. We have no basis for knowing on petitioner's presentation whether providing for LWOP as a legislative response to gravely serious nonhomicide offenses has evolved or is evolving to reflect changing standards of decency, particularly with respect to the youngest juvenile offenders.

Petitioner has shown on the third prong, however, that imposition of an LWOP sentence on society's youngest offenders for a nonhomicide, no-injury offense is freakishly rare—to the point where petitioner's evidence shows he is the only known recipient of such drastic punishment in any state in the country. The Attorney General does not dispute this fact. (See Equal Justice Initiative, Cruel and Unusual: Sentencing 13- and 14-Year-Old Children to Die in Prison (2007) pp. 13, 24, 27 <http://eji.org/eji/files/20071017cruelandunusual.pdf> [as of Apr. 30, 2009]; see also De La Vega & Leighton, *Sentencing Our Children to Die in Prison: Global Law and Practice* (2008) 42 U.S.F. L.Rev. 983, 985–986 [juvenile offender may be ineligible for parole only in United States].)

In *Furman v. Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], the Supreme Court found imposition of capital punishment on two defendants who committed rape violated the Eighth Amendment, with Justice Stewart explaining: "These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual." (*Furman*, at p. 309 (conc. opn. of Stewart, J.).) An arbitrary or capricious sentence serves no valid penological purpose. (See, e.g., *Godfrey v. Georgia* (1980) 446 U.S. 420, 439, fn. 9 [64 L.Ed.2d 398, 100 S.Ct. 1759] (conc. opn. of Marshall, J.).) Because a severe sentence " 'infrequently imposed' upon 'a capriciously selected random handful' " (*id.* at p. 438)—or in this case, a lone youth under 15 nationwide for a no-injury offense—amounts to a penalty so arbitrary that it constitutes cruel and unusual punishment, we hold defendant's LWOP sentence violates the Eighth Amendment.[9]

---

[9] Petitioner's evidence shows violent juvenile crime is far from rare, with, in 2001, 100 juveniles arrested for kidnapping and 12,182 arrested for assault—*in California alone*. (See Cal. Dept. of Justice, Cal. Criminal Justice Profile (2002) <http://stats.doj.ca.gov/cjsc_stats/prof01/00/3C.htm> [as of May 22, 2009].) And in the 10-year period between 1995 and 2004, petitioner's evidence indicates 1343 children age 14 or under were arrested for murder or non-negligent manslaughter nationwide. (See U.S. Dept. of Justice, Uniform Crime Reports: Crime in the United States (2004) p. 290 <http://www.fbi.gov/ucr/ucr.htm> [as of

## III

## DISPOSITION

The habeas corpus petition is granted. Let a peremptory writ issue directing the trial court to vacate petitioner's sentence of life in prison without parole. The trial court shall conduct a new sentencing hearing consistent with this opinion.

Bedsworth, Acting P. J., and Ikola, J., concurred.

On May 27, 2009, the opinion was modified to read as printed above.

---

May 22, 2009]; *id.* at p. 280 (2003); *id.* at p. 244 (2002); *id.* at p. 244 (2001); *id.* at p. 226 (2000); *id.* at p. 222 (1999); *id.* at p. 220 (1998); *id.* at p. 232 (1997); *id.* at p. 224 (1996); *id.* at p. 218 (1995).) Amdist all these offenses—and incalculably more worldwide—petitioner has been singled out in a manner similar to the arbitrariness of a lightning strike: he is the only youth under age 15 sentenced to LWOP for nonhomicide, no-injury crime.