Filed 5/30/13  P. v. Garcia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE GARCIA,<br><br>Defendant and Appellant. | B234395<br><br>(Los Angeles County<br>Super. Ct. No. BA303810) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Ronald S. Coen, Judge.  Affirmed as modified.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Defendant Jose Garcia appeals from the judgment after his conviction by jury of first degree murder in violation of Penal Code section 187, subdivision (a).[1] The jury found true the special circumstance allegations that the murder was committed during the commission of a robbery and a carjacking (§ 190.2, subd. (a)(17)). The jury also found true the allegations that defendant personally used a firearm and personally and intentionally discharged a firearm which proximately caused great bodily injury and death within the meaning of section 12022.53, subdivisions (b), (c) and (d). A different jury previously convicted defendant of unlawful firearm activity pursuant to section 12021, subdivision (d)(1).[2]

The trial court sentenced defendant to life in prison without the possibility of parole for first degree murder. For the firearm enhancements, it imposed a consecutive term of 25 years to life (§ 12022.53, subd. (d)), and also imposed and stayed 20-year and 10-year terms (§ 12022.53, subds. (c) & (b) respectively). For the unlawful firearm activity, the trial court imposed the upper term of three years to run concurrently with the first degree murder sentence. The court imposed various fines and fees including a court security fee of $40 per count for a total of $80.

Defendant contends the trial court improperly relied on an element of the offense (defendant's probation status), to impose the upper term on the unlawful firearm activity conviction. He also contends the sentence of life without the possibility of parole is cruel and unusual punishment under both state and federal law. We modify the judgment to reduce the total security fee to $60, but otherwise affirm.

**FACTS**

### 1. Procedural background

The underlying proceeding involved three trials. The first jury deadlocked on both counts and the court declared a mistrial. The second jury found defendant guilty of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] In January 2012, this section was renumbered as section 29815.

2

unlawful firearm activity but deadlocked on whether defendant was guilty of first degree murder, and a mistrial was declared as to that count.[3] The third jury found defendant guilty of first degree murder and found the firearm and special circumstance allegations to be true.

## 2. Prosecution evidence[4]

On January 17, 2006, Emilio Isaac Huesca was driving a red Cadillac owned by his friend, Armando Arias, in the City of Los Angeles, with Arias as a passenger. The Cadillac was equipped with various electronics including television screens mounted on the back of the front seat headrests, and a PlayStation. At approximately 11:45 p.m., Detective Kelle Baitx of the Los Angeles Police Department responded to a shooting call and found Arias in an alley behind his house. Arias had been shot several times and was on his knees facing the wall. His upper body was leaning against the wall. The red Cadillac was gone. Detective Baitx found a single bullet on the ground and it was booked into evidence and submitted for testing.

Detective Tommy Thompson interviewed Huesca and testified that Huesca told him that two people in a car blocked the Cadillac in the alley.[5] Surveillance video cameras were located at a Laundromat across the street from the alley but did not capture the shooting. A video time stamped at 11:30 p.m. showed a car similar to defendant's mother's Acura, circle the area and then back up into the alley.

Dr. Stephen Scholtz, a deputy medical examiner in the Los Angeles County Coroner's Office and a forensic pathologist conducted an autopsy on Arias's body, which had 12 entry wounds located on the back of the body. One entry wound was in the head

---

[3] The jury was deadlocked with 11 votes for guilty and one vote for not guilty.

[4] In the second trial, in which the jury found defendant guilty of unlawful firearm activity, the parties stipulated that prior to January 17, 2006, a court ordered defendant not to possess a firearm. The facts relevant to the issues on appeal are taken from the third trial.

[5] Huesca did not testify and at the time of trial his whereabouts were unknown.

by the right ear and the majority were located in the lower back of the torso. The gunshots damaged Arias's internal organs and three of the wounds were fatal. The cause of death was multiple gunshot wounds and the downward trajectory of the bullets was consistent with the victim being shot from behind, as he knelt on the ground. Dr. Scholtz recovered four medium caliber bullets from Arias's body during the autopsy.

Los Angeles Police Department Officer Genaro Arredondo, a firearms expert, conducted forensic testing on the expended bullet found at the shooting scene and those recovered by Dr. Scholtz. All five bullets were of the same general caliber and were fired from either a nine-millimeter, .38-caliber, or .357-caliber gun. Two of the bullets recovered from Arias's body were fired from a single gun. The other three bullets were extensively damaged and Officer Arredondo could not definitively establish that they were also fired from the same gun.

At about 3:00 p.m. on January 18, Rolando Gavidia saw a large flatbed tow truck dropping off a red Cadillac on the street outside his house. Gavidia saw his neighbor, Russell Garcia, speak with two young men in a white Explorer that accompanied the tow truck. One of the young men was later identified as Ramon Garcia, Russell's son.[6] Gavidia's son called the police to report the presence of the red Cadillac. All electronic equipment including the stereo and headrest television screens had been removed from the Cadillac.

Detective Thompson interviewed Ramon at a juvenile camp. Defendant paid Ramon and Luis Flores to dispose of the stolen Cadillac. The car battery did not work when the electronic equipment was removed so defendant arranged for the Cadillac to be transported to Russell's house. Ramon identified defendant by his distinctive gang tattoos and street moniker.

Defendant was arrested on June 1, 2006, and advised of his constitutional rights. The detectives told defendant the entire shooting was captured on video. Initially,

---

[6]    We refer to Russell Garcia and his son Ramon Garcia by their first names to avoid confusion, not out of disrespect. They are not related to defendant.

4

defendant did not talk to the detectives but when walking toward the booking area at the police station he told Detective Thompson that he thought the Cadillac belonged to Huesca. He had been in the Cadillac with Huesca in the past and about two weeks before the shooting followed him with the intention of stealing the car and selling the electronics. Detective Thompson took defendant aside when he started to provide additional details of the shooting and recorded the conversation.[7] On the day of the shooting, defendant saw Huesca driving the Cadillac and followed the car to the alley. He used his mother's Acura to block the Cadillac from leaving the alley. He ordered Arias and Huesca out of the car and told them to face the wall and not to look at him. Arias "kept fidgeting" and defendant shot him with a .38-caliber gun. He took the Cadillac to his mother's house and removed all of the electronic equipment. He asked his friends Ramon and Flores to help dispose of the Cadillac and told them it was stolen, but "not that hot." Defendant paid for a tow truck to move the Cadillac because the battery stopped working. Defendant said he disposed of the gun but would not disclose the location. He also refused to identify the individual that drove his mother's Acura away from the crime scene. At the end of the interview, defendant was told he was allowed to make a telephone call.

Defendant's cell had a telephone and a monitoring device and defendant's side of the conversation was recorded when he made a call.[8] Defendant said, "Shit they got me motherfucker. For the murder. They got me for murder. . . . They got me on video and they fuckin.' They got me driving and shit." In Spanish, defendant said, "they have everything, dude, they have everything."

---

[7]    A compact disc containing an audio recording of the interview was played for the jury and, along with a transcript, was admitted into evidence.

[8]    A compact disc containing an audio recording of defendant's portion of the conversation was played for the jury and, along with a transcript, was admitted into evidence.

## DISCUSSION

### I. Dual Use Doctrine

Defendant claims that the trial court violated California Rules of Court, rule 4.420(d),[9] known as the dual use doctrine, by using a factor that was an element of the crime of unlawful firearm activity (§ 12021, subd. (d)(1))[10] to justify imposing the upper term for the same crime. The People respond that defendant has forfeited any challenge to his sentence on this basis because he failed to object in the lower court to the court's imposing the aggravated term.

The Supreme Court, in *People v. Scott* (1994) 9 Cal.4th 331, held "that the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices. Included in this category are cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." (*Id.* at p. 353.) The court concluded, "In sum, we hold that complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.)

In the instant case, defendant had an opportunity to do so but did not interpose an objection at the sentencing hearing or argue that the trial court's consideration of his probation status was improper or somehow constituted an impermissible dual use of

---

[9] California Rules of Court, rule 4.420(d) provides: "A fact that is an element of the crime upon which punishment is being imposed may not be used to impose a greater term."

[10] In January 2006, when defendant committed the offenses herein, section 12021, subdivision (d)(1) stated in relevant part: "Any person who, as an express condition of probation, is prohibited or restricted from owning, possessing, controlling, receiving, or purchasing a firearm and who owns, purchases, receives, or has in his or her possession or under custody or control, any firearm . . . is guilty of a public offense . . . ."

facts. We therefore conclude that his appellate challenge to the trial court's sentencing choices and supporting rationale must be deemed waived.

## II. Constitutionality of Defendant's Life Without Parole Sentence

Defendant contends that his sentence of life without the possibility of parole violates the Eighth Amendment's and the State Constitution's proscriptions against cruel and unusual punishment because it was grossly disproportionate.[11] We find this argument unavailing.

First, defendant failed to raise this contention in the trial court and therefore forfeited the issue on appeal. Nevertheless, to forestall a subsequent ineffectiveness of counsel claim and in the interest of judicial economy, we consider the issue. (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

Under the Eighth Amendment of the federal Constitution, we must assess three factors to determine whether a sentence is disproportionate to the offense: (1) the gravity of the offense and the harshness of the penalty; (2) sentences imposed for other crimes in the same jurisdiction; and (3) sentences imposed for the same crime in other jurisdictions. (*Ewing v. California* (2003) 538 U.S. 11, 22.) Defendant makes no attempt to present an intrastate comparison of sentences for other crimes or an interstate comparison of sentences for the same crime. His argument fails on this basis alone.

Under the California Constitution, we assess whether a punishment "shocks the conscience and offends fundamental notions of human dignity" based on a number of factors, including: (1) the nature of the offense and/or the offender; (2) a comparison of the sentence with punishments prescribed in California for different offenses; and (3) a comparison of the challenged sentence with punishments prescribed for the same offense in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 424.) We reject defendant's

---

[11] "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.) "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

claim of disproportionality under the California Constitution for the same reason that we reject his federal claim—he has failed to offer any inter- and intrastate comparisons.

*People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*), on which defendant relies, holds that murder committed in the commission of a robbery is a serious crime presenting a high level of danger to society. In that case, however, our Supreme Court concluded the facts of the specific crime in question and the defendant's culpability weighed in favor of concluding the imposition of a life sentence constituted cruel or unusual punishment. (*Id.* at pp. 488–489.) The particular facts of *Dillon* were central to our Supreme Court's conclusion. The shooting in *Dillon* occurred during an attempt to steal marijuana plants the victim was cultivating. (*Id.* at pp. 451–452.) The defendant had previously overheard the victim threaten to shoot anyone coming on his property. (*Id.* at p. 451.) An accidental firearm discharge during the attempted robbery alerted the victim to the presence of the defendant and his cohorts. (*Id.* at p. 452.) The defendant heard the victim approaching, saw him carrying a shotgun, and, "[w]hen [the victim] drew near, defendant began rapidly firing his rifle at him." (*Ibid.*) The facts in *Dillon* contrast dramatically with the carjacking, robbery and murder of Arias.

Defendant had a prior criminal history and was on probation at the time of the murder. Defendant chose to take the Cadillac while it was being driven, thereby guaranteeing a confrontation with the owner. He carefully planned the carjacking having followed Huesca some two weeks earlier. Defendant chose to force Arias and Huesca to kneel by the wall when they exited the Cadillac and did not leave immediately with the Cadillac. When Arias "fidgeted," defendant shot him in the back and head 12 times. He then stripped the Cadillac of its electronic components and made plans with his friends to dispose of it. Defendant showed no remorse in his statements to police or at sentencing.

Defendant contends that his sentence constitutes cruel and unusual punishment because he was "barely more than a child himself" when the shooting occurred. Defendant was 18 years old, and, under these circumstances, we find the factor of defendant's age was "substantially outweighed by the seriousness of the crime and the

8

circumstances surrounding its commission . . . ." (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 17.)  Successful challenges to sentences on the grounds of cruel and unusual punishment are rare.  (*In re Nuñez* (2009) 173 Cal.App.4th 709, 734, 735.)  This is not one of the rare cases in which the sentence imposed should be reduced as cruel and unusual.

## III.   Court Security Fee

Defendant argues, and the People concede, that the trial court improperly imposed a total security fee of $80, pursuant to section 1465.8, subdivision (a)(1).  At the time of defendant's conviction on count 2, on October 27, 2008, former section 1465.8, subdivision (a)(1) provided:  "To ensure and maintain adequate funding for court security, a fee of twenty dollars ($20) shall be imposed on every conviction for a criminal offense . . . ."  As of October 19, 2010, the security fee was increased to $40.  (§ 1465.8, subd. (a)(1), as amended by Stats. 2010, ch. 720, § 33.)  Because the $40 security fee was unauthorized at the time defendant was convicted of count 2, we will correct the judgment.  (See *People v. Davis* (2010) 185 Cal.App.4th 998, 1000 [new court facilities fee imposed by Gov. Code, § 70373 does not apply to cases in which the defendant's conviction was rendered before effective date]; *People v. Alford* (2007) 42 Cal.4th 749, 754 [§ 1465.8's "legislative history supports the conclusion the Legislature intended to impose the court security fee to all convictions after its operative date"].)

**DISPOSITION**

The judgment is modified to reduce the section 1465.8 court security fee from $80 to $60 for the reasons stated herein. The trial court is directed to send a corrected abstract of judgment to the Department of Corrections and Rehabilitation reflecting the modification in the amount of the court security fee. In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *
　　　　　　　　　　　FERNS

We concur:


_____, Acting P. J.
　　ASHMANN-GERST


_____, J.
　　CHAVEZ

---

\* 　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.