Filed 6/22/16  P. v. Gutierrez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS ANGEL GUTIERREZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B261989<br>(Super. Ct. No. 2008011529)<br>(Ventura County) |

In 2008, 17-year-old Luis Angel Gutierrez stabbed his aunt to death during the commission of a rape or attempted rape.  Appellant was convicted by jury of first degree special circumstances murder and sentenced to life without parole (LWOP).  (Pen. Code, § 190.5, subd. (b).)[1]  Our state Supreme Court reversed and remanded for resentencing in light of *Miller v. Alabama* (2012) 567 U.S. __, [132 S.Ct. 2455] (*Miller*) which requires that a trial court, in exercising its sentencing discretion, consider the " 'distinctive attributes of youth' " and how those attributes " 'diminish the penological justifications' " for imposing a LWOP sentence.  (*People v. Gutierrez* (2014) 58 Cal.4th

---

[1] All statutory references are to the Penal Code.  Section 190.5, subdivision (b) provides in relevant part:  "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

1354, 1361, quoting *Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2465].) On remand, the trial court conducted a new sentencing hearing and imposed an LWOP sentence from which appellant appeals. We affirm.

*Facts*

On March 16, 2008, appellant sexually assaulted Josefina Gutierrez in her bedroom. He also stabbed her 28 times. Josefina lived with her husband and sons, and provided appellant a home after he moved to the United States to work as a cook. Appellant and his father shared a bedroom in the house.

Josefina was asleep when her husband left for work at 4:20 a.m. that Sunday morning. Appellant took his shoes off, entered the house, armed himself with a large kitchen knife, and silently entered Josefina's bedroom. Abraham Gutierrez, a nephew, heard someone open the bedroom door and saw appellant in the kitchen with a cut right hand. Appellant tried to hide the injury and said "[s]ome guys cut me" in a fight. Appellant left five minutes later.

Jose Luis Mendoza, Josefina's brother, saw blood on the floor and the bedroom door ajar. Josefina was naked, lying face down with her legs spread apart. A large knife protruded from her back. There were fresh bruises on her face and body and 28 stab wounds to the back, shoulder, hands, chest, face, and neck.

Appellant admitted himself to Los Robles Hospital in Simi Valley. He claimed that a Hispanic gang member stabbed him in the hand at a party.[2] A sexual assault nurse examiner found blood on the head of appellant's penis and Josefina's DNA on his scrotum. There was blood between appellant's toes, and hairs and fibers stuck to the bottom of his feet.

The police found bloody handprints on Josefina's thighs, blood on the bedroom walls and ceiling, and blood spatter and smears. Appellant's DNA was on

_____

[2] Appellant told a detective that 15 drug dealers kidnapped him in front of his house and drove him to a mall where they cut his hand and stabbed him in the leg because he owed $200 for methamphetamine. The drug dealers drove appellant back to Simi Valley and told him that he had 15 days to come up with their money.

2

Josefina's perianal area, her buttocks and inner thighs.  The blood marks on Josefina's back were consistent with an erect penis being dragged across her back.  Officers searched appellant's bedroom and found bloody socks, shoes, and pants.  Blood was on the outside and inside of appellant's car and a bloodstained dress shirt was in the car.

Appellant underwent hand surgery and was released three days later.  In a *Miranda* interview (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]), he gave conflicting accounts about what happened.  Appellant said that he purchased methamphetamine at a birthday party and that 10 to 15 men beat and stabbed him.  Simi Valley Police Officer Lincoln Purcell told appellant that the house had been under surveillance and no one saw a group of men harm anyone at the party.

Appellant changed his story and said that he got home at 5:30 a.m. and knocked on Josefina's bedroom door.  The two argued and Josefina attacked him with a knife.  Appellant claimed that Josefina cut him and then stabbed herself.

When Officer Purcell informed appellant that Josefina was stabbed in the back multiple times, appellant said that Josefina stabbed herself to falsely incriminate him.  After Josefina cut his hand, appellant said that he grabbed the knife and stabbed her in the back two times.  Appellant denied stabbing Josefina in the face or neck or having sex with her.  Officer Purcell asked why blood was on appellant's penis.  Appellant said that Josefina sexually assaulted him, took off her nightshirt, and that he fell on top of her after she pulled his pants down.

Appellant was convicted of first degree murder with the special circumstances finding that the murder was committed during the commission of a rape or attempted rape.  (Pen. Code, §§ 187, subd. (a); 189; 190.2, subd. (a)(17)(C); 261.)  The jury found that appellant personally used a deadly weapon (§ 12022, subd. (b)(1)) and was over 14 years of age at the time of the offense (Welf. & Inst. Code, § 602, subd. (b)(1)).  Appellant was sentenced to life without possibility of parole (LWOP) plus one year on the weapon enhancement (§§ 190.5, subd. (b); 12022, subd. (b)(1)).

*Remand for Resentencing*

After we affirmed the conviction (B227606), our state Supreme Court remanded for resentencing in light of *Miller* which was decided after appellant's trial. (*Gutierrez, supra*, 58 Cal.4th at p. 1361.) Before *Miller*, California courts interpreted section 190.5, subdivision (b) "as establishing a presumption in favor of life without parole for juvenile offenders who were 16 years of age or older when they committed special circumstance murder." (*Gutierrez, supra*, 58 Cal.4th at p. 1369*.*) Harmonizing section 190.5, subdivision (b) with the Eighth Amendment protections clarified in *Miller*, the *Gutierrez* court held that section 190.5, subdivision (b) "confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole." (*Id.*, at p. 1387.) Before imposing a LWOP sentence on a juvenile homicide offender, the sentencing court must consider five factors enumerated in *Miller*: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's home and family environment; (3) the circumstances of the homicide offense; (4) the juvenile's cognitive ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation. (*Id.*, at pp. 1388-1389.)

The *Gutierrez* court acknowledged that "not every factor will necessarily be relevant in every case. For example, if there is no indication in the presentence report, in the parties' submissions, or in other court filings that a juvenile offender has had a troubled childhood, then that factor cannot have mitigating relevance. But *Miller* 'require[s] [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Id.*, at p. 1390.) In a concurring opinion, Justice Corrigan emphasized that "[t]he appropriate sentence for any *particular* minor remains a question for the sentencing court. As the *Miller* majority observed: 'Our decision does not categorically bar a penalty for a class of offenders or type of crime . . . . Instead, it mandates only that a sentencer follow a certain process - considering an offender's youth and attendant

4

characteristics - before imposing a particular penalty.' [Citation.]" (*Id.*, at pp. 1393-1394.)

On remand, the trial court considered the prosecution's sentencing memo, appellant's sentencing brief, a neuropsychological report prepared by Inés Monguió, Ph.D., photographic evidence admitted at trial, the probation report, the court's notes from the original sentencing hearing, the Supreme Court *Gutierrez* decision, a DVD chronicling the victim's life, a victim impact statement, and a YouTube video on the developing brain of an adolescent. The trial court found that appellant suffered no mental illness or developmental disability and that none of the youth-related factors articulated in *Miller* warranted a sentence of 25 years to life. It found that the murder was "well planned as demonstrated by the evidence including the knowledge of the victim's husband's work schedule, the evidence of waiting outside the home, the evidence of secretly or unnoticingly entering the house by taking off his shoes, [and] by arming himself prior to the crime. Those things in my view are entirely inconsistent with recklessness, impulsivity and [an] underdeveloped sense of consequences." The trial court found that appellant, despite his youth, appreciated the consequences of his action, had no remorse, and that appellant's motive was to commit a violent sex act on an unsuspecting victim. "There is no factor, no extraneous factor . . . that . . . you could . . . look at and say oh, that's the way a youthful offender would respond."

*Right to Jury Trial*

Appellant argues that he was denied the right to a jury trial at sentencing. Appellant forfeited the issue by not objecting or requesting a jury. The matter was remanded in light of *Miller* which requires that the *trial court*, in exercising its sentencing discretion, consider the " 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.]" (*Gutierrez, supra*, 58 Cal.4th at p. 1361.) Because it was a limited remand, appellant is precluded from arguing that the *Miller* factors should have been decided by a jury. (See *People v. Deere* (1991) 53 Cal.3d 705, 713 [only errors within the scope of the remand

5

are cognizable in second appeal]; *People v. Murphy* (2001) 88 Cal.App.4th 392, 396–397 ["In an appeal following a limited remand, the scope of the issues before the court is determined by the remand order."].)

On the merits, appellant cites no authority that a juvenile homicide offender has a statutory or constitutional right to jury trial on *Miller* sentencing factors. *Miller* makes clear that the special considerations attendant to youth are to be decided at time of sentencing. (See e.g., *Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2466].) Juries are not "sentencers" and do not decide punishment in a non-capital case. (CALCRIM 3550; *People v. Nichols* (1997) 54 Cal.App.4th 21, 24.)

It is well settled that any fact that increases the penalty for a crime *beyond the statutory maximum* must be proved to a jury beyond a reasonable doubt in order to satisfy the Sixth Amendment right to jury trial. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 455] (*Apprendi*); *People v. Black* (2007) 41 Cal.4th 799, 812.)[3] Here, the jury found that it was a special circumstances murder and that appellant was over 14 years of age at the time of the offense. What, then, is the maximum sentence authorized by the verdict? Section 190.5, subdivision (b) provides that the trial court may, in its discretion, sentence appellant to LWOP or 25 years to life state prison. LWOP is the statutory maximum sentence but the *Miller* factors may reduce the punishment to 25 years to life state prison. *Apprendi*, however, does not afford appellant the right to have a jury decide or weigh those factors. (See e.g., *People v. Sandoval* (2007) 41 Cal.4th 825, 839; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230.) "[S]o long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution

---

[3] In *Hurst v. Florida* (2016) __ U.S. __ [136 S.Ct. 616], the maximum sentence a capital felon could receive on the basis of a conviction alone was life imprisonment. The trial court, however, had the authority to impose a death sentence if the jury rendered an "advisory sentence" of death and the court found an aggravating circumstance. The United States Supreme Court concluded tht the "hybrid" procedure violated *Apprendi* and *Ring v. Arizona* (2002) 536 U.S. 584 [122 S.Ct. 2428] because the jury's function was advisory only. (*Hurst v. Floridia, supra*, __ U.S. at p. __ [136 S.Ct. at pp. 621-622].)

permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury." (*People v. Black, supra*, 41 Cal.4th at p. 813.)

*People v. Dillon*

Appellant contends that the LWOP sentence is grossly disproportionate to the offense and should be reduced to a life sentence based on *People v. Dillon* (1983) 34 Cal.3d 441 (*Dillon*). We rejected a similar argument in the first appeal. The case was not remanded for a *Dillon* analysis nor did appellant ask the trial court to make a *Dillon* analysis at resentencing. "Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court. Here, the matter was not raised below, and is therefore waived on appeal." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.)

Appellant makes no showing that the LWOP sentence is grossly disproportionate to the severity of the crime or violates the constitutional prohibition against cruel and/or unusual punishment. (*Solem v. Helm* (1983) 463 U.S. 277, 287 [77 L.Ed.2d 637, 647-648]; *Dillon, supra*, 34 Cal.3d at pp. 477-478.) It was a heinous murder. Appellant repeatedly stabbed the victim during the commission of a brutal sexual assault. Appellant lied to family members, and was calm and collected when he left the house. He showed no remorse and, when confronted by the evidence, had the audacity to say the victim sexually assaulted him and stabbed herself. Following the *Miranda* interview, appellant accompanied the officers to the crime scene and calmly walked through the bloodstained bedroom. His only concern was that his socks might get stained by the blood.

Successful challenges to a LWOP sentence based on *Dillon* are extremely rare. (See e.g., *In re Nuñez* (2009) 173 Cal.App.4th 709, 725 ["rarest of the rare"]; *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 ["exquisite rarity"]; *People v. Em* (2009) 171 Cal.App.4th 964, 977 [successful grossly disproportionate challenges are

7

' "exceedingly rare" ' and appear only in an ' "extreme" ' case].)  Appellant makes no showing that the LWOP sentence shocks the conscience, is grossly disproportionate to the offense, or is cruel and/or unusual punishment under the federal and state Constitutions.  (*People v. Dillon, supra*, 34 Cal.3d at p. 478; *People v. Cunningham* (2001) 25 Cal.4th 926, 1042.)

### *Miller Factors On Resentencing*

On resentencing, the trial court considered a neuropsychological report detailing appellant's family history and upbringing, his substance abuse, his mental development, and pertinent psychosocial factors.  Based on self-serving statements in the report, appellant argues that the following *Miller* factors weigh against the imposition of a LWOP sentence.

### *Upbringing and Living Conditions*

Appellant claims that he suffered an impoverished and unsupervised childhood that rendered him a vulnerable and immature 17-year-old.  Appellant's father left Mexico to work in the United States and told six-year old appellant he would have to be the "man of the house."  Appellant grew up near Mexico City and supported his mother and sisters.  He worked for a neighbor, lost his job, and sold chocolates in the streets which older men commonly did to support their families.  Appellant was sexually involved with a woman who was eight years his senior and an alcoholic.  He had plans to expand his chocolate business.  At age 16, appellant decided to move to California and work as a cook under his father's mentorship.  The trial court found that appellant was quite industrious in Mexico, got along well with adults, and had very normal sexual experiences with women.  "[N]one of those things demonstrate to me that the characteristics of an immature brain were acting upon [appellant] in his everyday life."

Appellant argues that it is "shocking" that the trial court did not consider his upbringing to be a mitigating factor.  *Miller* requires that the sentencing court focus on family factors that render the juvenile offender vulnerable to negative influences and outside pressures.  If the juvenile offender had an abusive and dysfunctional family life,

8

the offender may lack the ability to extricate himself/herself from horrific, crime-producing settings. (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2464].) But none of those factors describe appellant's childhood. Appellant completed eight years of schooling with better than average grades and exhibited few behavioral problems. As a teenager, he drank beer with friends but declined to participate in their "stupid" behavior. His mother never saw him drunk and no one thought he had a drinking problem. Appellant felt responsible for the safety of his family, supported his family, and acted older than his age. He got along well with adults and had normal sexual experiences with older woman, and had no history of violence or sexual abuse.

The trial court acknowledged that the *Miller* attributes of a youthful offender include "immaturity and recklessness and impulsivity . . . . [W]e are talking about immaturity and recklessness and impulsivity. . . [W]e are talking about vulnerability to negative influences and outside pressures or limited control over an environment and limited ability to extricate oneself from a crime-producing setting or susceptibility or influence in psychological damage[.] [N]one of those things are evidence[d] in [appellant's] general behavior."

Appellant argues that he had no parental supervision and worked in the streets selling chocolates even though state law prohibits children from working during school hours. That may be the law in the United States but not in Mexico where appellant was raised. In Mexico, six years of education is the norm. Appellant completed eight years of schooling, was gainfully employed, acted older than his age, and was not influenced by peers.

Appellant was raised by his mother but kept in contact with his father. If appellant misbehaved, his father chastised him over the phone. Appellant was close to his father and moved to California to be mentored by his father. Before the murder, appellant rented a room with his father in Josefina's house and was treated like family. It was a close knit, supportive family. All of the male adults in the household were gainfully employed and either encouraged or obtained employment for appellant. A

9

month before the murder, Josefina got the family together to celebrate appellant's birthday.  There is no evidence that appellant had an abusive childhood or was raised in a dysfunctional home environment.  (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2468].)

*Cognitive Limitations*

Appellant argues that he suffers from cognitive limitations and substance abuse problems that are mitigating sentence factors.  The trial court found that appellant "suffered no mental illness or . . . developmental disabilities. . . .  Dr. Monguió, of course, talked about a long and extreme history of substance abuse.  [Appellant] denies that in his assessment with the California Department of Corrections.  He denies having a substance abuse problem."  Appellant did not believe he had a substance abuse problem or seek treatment in prison.  Appellant denied that he bought or sold drugs or knew the price of drugs, and told Dr. Monguió that he only used drugs when he partied with his cousins.

The neuropsychological report states that appellant tested in the mentally retarded range and had a boarder line verbal comprehension.  The trial court found that the test results were not credible.  Appellant had the mental acumen to dupe the police into believing that he was 21 years old and fabricated stories about his innocence.  In a two-hour-forty-minute *Miranda* interview that was videotaped, appellant presents himself as an alert young man who is sober, calm, and responsive to the officers' questions.  The trial court found that appellant understood his rights and was in control of the situation.  That is consistent with Dr. Monguió's report which states that appellant is alert, oriented in all spheres, has an average intellect with no thought disorders, and has fair to good insight and judgment with "tight" associations.  The report states that "[t]here appears to be no deficits of executive functions that would lead to impulsivity or poor judgment."

The trial court found that appellant "immediately appreciated the consequence of his actions when he left [the victim's bedroom], when he lied, when he convinced -- under that very horrific scenario convinced the victim's family members that nothing other than a boyhood folly . . . caused his injuries . . . .  He fled to what he would

10

consider a safe haven at his cousin's house. There's no doubt and there's no other logical conclusion from the evidence other than he appreciated the consequences of his behavior and there would be no other reason to lie or to dispose of evidence, no other explanation for that." The court found that appellant was not "vulnerable to negative influences or outside pressures. There is no one else associated with this crime. There are no codefendants. There are no older cousins encouraging him to behave badly. There is no one dragging him along in a group mentality to commit some type of group offense. . . . There is no evidence to support the conclusion that his youthful brain caused him to have limited control over his environment or the ability to extricate himself from the crime-producing setting."

Appellant argues that he tested positive for alcohol and methamphetamine the day of the murder, but that is not a mitigating *Miller* factor. Appellant carried out a well-planned murder by removing his shoes, quietly entering the house, and arming himself with a kitchen knife. Appellant went in and out of the victim's bedroom without alerting family members, hid evidence, and lied to family members. At the hospital, he fabricated an elaborate story about how he was attacked by a gang member. Although a lab report indicated that appellant had alcohol and methamphetamine in his system, none of the people who spoke to appellant the day of the murder -- family members, a cousin, hospital staff, and police officers --- reported that appellant was intoxicated or appeared to be under the influence of drugs.

*Nature of the Crime*

Appellant argues that the nature of the crime demonstrates lack of maturity and recklessness and impulsivity. We disagree. The murder was well planned and carried out with stealth. The trial court found that the victim and victim's family "treated him as [their] own. And I can't identify any reason why he would do this except to satisfy his own selfish sexual desires, which in my view are completely inconsistent with the youthful offender."

11

*Inability to Explain Crime*

Appellant argues that he would not have killed anyone "if not for the drugs" and that his inability to explain the murder "can itself be attributed to the drugs." Although appellant had methamphetamine in his system the day of the murder, there is no evidence that appellant was drug impaired. In a presentence probation interview, appellant laughed, smiled, and smirked when asked about the murder. Appellant was almost jovial and said he got a "little crazy." The trial court found that appellant provided "absolutely no explanation as to why he did this. . . . [H]e couldn't explain it to the doctor that was there to . . . evaluate him and present the best evidence to the court."

*Potential for Rehabilitation*

*Miller* requires that the sentencing court consider the potential for rehabilitation and whether the defendant appreciated the risks and consequences of committing the murder. Appellant repeatedly stabbed the victim during a violent sexual assault and, three days later, told the police that the victim sexually assaulted him and stabbed herself. When appellant was told that the victim was dead, he smiled and showed no signs of remorse. At trial, appellant seemed proud of what he did when photographs of the murder scene were displayed to the jury.

The trial court found that there are no "circumstances that demonstrate that [appellant] can be rehabilitated. [Appellant's] behavior in custody prior to trial was atrocious. . . ." When appellant got to prison, his crimes included "fighting, mutual combat, fighting in custody." Taking into account appellant's age, background, maturity, and lack of remorse, the trial court reasonably concluded that appellant is incorrigible, is extremely dangerous, and exhibits such irretrievable depravity that rehabilitation is impossible. (*Gutierrez, supra*, 58 Cal.4th at p. 1391.) "The trial court here thoughtfully weighed the applicable factors, particularly defendant's youth and its attendant circumstances, and implicitly concluded defendant was unfit ever to reenter society. We cannot say it exceeded the bounds of reason, all of the circumstances being considered,

12

under section 190.5, subdivision (b).  [Citation.]"  (*People v. Palafox* (2014) 231 Cal.App..4th 68, 91.)

*Conclusion*

Substantial evidence supports the finding that appellant is a " 'rare juvenile offender whose crime reflects irreparable corruption.' [Citations.]"  (*Miller, supra*, 567 U.S., at p. __ [132 S.Ct. at p. 2469].)  In sentencing appellant to life without parole, the trial court gave due consideration to all the *Miller* factors including appellant's age and "its hallmark features - among them, immaturity, impetuosity, and failure to appreciate risks and consequences," family and home environment, the circumstances of the homicide, and family and peer pressures.  (*Id.*, at p. __ [132 S.Ct. at p. 2468].)  Appellant makes no showing that the trial court abused its discretion by imposing an LWOP sentence.

The judgment (order resentencing appellant to LWOP) is affirmed.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:


PERREN, J.


TANGEMAN, J.

13

Patricia M. Murphy, Judge

Superior Court County of Ventura

_____

Jean F. Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Shawn McGahey Webb, Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.