Filed 4/19/21  P. v. Williams CA2/4
Opinion after vacating opinion filed on 4/19/21

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B300657 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA476776) |
| v. | |
| LONA WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Sortino, Judge.  Affirmed.

Tracy L. Emblem, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Lona Williams cut a woman's face with a broken glass pipe and stole $50 from her. A jury found defendant guilty of second degree robbery and assault with a deadly weapon, and found that she inflicted great bodily injury. The trial court denied defendant's *Romero*[1] motion and sentenced her to an aggregate term of 15 years.

Defendant contends that the trial court erred by denying her request for a self-defense instruction on the assault count. She argues that the trial court further erred by denying her *Romero* motion and declining to stay her sentence for the assault pursuant to Penal Code section 654.[2] We find no error and affirm.

## PROCEDURAL HISTORY

An amended information filed June 17, 2019 charged defendant with second degree robbery (§ 211) and assault with a deadly weapon (§ 245, subd. (a)(1)), both serious felonies (§ 1192.7, subd. (c)). The amended information alleged that defendant personally inflicted great bodily injury upon the victim, Regina P., during the commission of both offenses. (§ 12202.7, subd. (a).) It further alleged that defendant previously suffered a conviction for criminal threats (§ 422) that was both a serious felony (§ 667, subd. (a)(1)) and a strike (§§ 667, subds. (b)-(j), 1170.12).

A jury found defendant guilty of both offenses and found the enhancement allegations true. Defendant admitted her prior conviction, and the trial court found she had violated her probation. The trial court denied defendant's *Romero* motion

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

(§ 1385).  It sentenced her to a total prison term of 15 years in state prison:  the high term of five years on the robbery count, doubled to 10 years due to her strike, plus a consecutive term of one year on the assault count (one-third the midterm), doubled to two years due to her strike, plus three years for the great bodily injury enhancement.  The court imposed concurrent sentences for defendant's probation violations, and exercised its discretion to stay the five-year enhancement under section 667, subdivision (a).

Defendant timely appealed.

## FACTUAL BACKGROUND

At trial, Regina P. testified to the following.  On April 6, 2019, she was living in a tent on Los Angeles's Skid Row. Defendant and her husband or partner lived in a tent down the street.  Regina knew defendant and saw her around frequently, but did not consider her a friend.

During the early morning hours of April 6, 2019, Regina walked to an ATM and withdrew four $50 bills.  She put the money in her bra.  On her way back to her tent, Regina stopped at a tent whose occupant sold various sundries to Skid Row residents.  Using some of her cash, she purchased cigarettes and a shot of tequila. Regina also purchased a drink for defendant, who was at the "store" at the time.  Regina put her change in her pants pocket and walked back to her tent.  Defendant accompanied her.

Regina went inside the tent, where she sat on a mattress with a man named "Nephew." Defendant  sat on a chair near the entryway.  The trio talked, drank, and smoked crack cocaine. They were high and intoxicated.  After about 45 minutes, defendant stood up "all of a sudden" and said, "I'm gonna take

3

your money." Defendant had a "crazy," "evil," or "deviant" look on her face, and a broken, jagged-edged glass pipe in her fist, which she extended toward Regina.

Regina told defendant, "Oh, no you're not," and "pulled her legs to get her to fall down." Regina then climbed onto defendant to "try to hold her arms down from her getting me with that pipe." Regina said she "had [her]arms down, pressed to [defendant's] throat" at this point, but was not applying pressure: "I really was tryin' to stop . . . her arms goin' all over the place with that thing in her hand." Regina also stated that she "tried to dig [defendant's] eyes out with her fingers" and "whoop her ass," "to stop her from stabbing me."

Regina, who was 5'7" and 100 pounds, was unable to overpower defendant, who was about 5'4" and "stocky." Defendant stabbed Regina in the head with the pipe, Regina tried to protect herself with her hands, and the women rolled around the tent. While they were rolling around, defendant grabbed some of the money out of Regina's bra. Defendant broke free and continued to stab and strike Regina. She also bit Regina's face and said, "Oh, you're gonna give me your money. Oh, yes, you are. Oh, yes you are."

Regina "couldn't do nothing" to stop defendant. She tried to protect her head and face with her hands, which sustained "bad, deep cuts" between her fingers and around her knuckles. Regina also felt "wetness" and "leaking" on her face from the cuts defendant made there. She thought defendant "used something different" for one of the large cuts down the side of her face, and also to "slice all the way across my tent." Regina was unsure, as she had moved in and out of consciousness during the altercation.

4

At some point, the altercation moved outside the tent. Regina recalled waking up about 15 feet away from her tent, and seeing police and emergency medical personnel nearby. She realized then that all of the money was missing from her bra, though she still had a few small bills in her pockets.

Medical personnel treated Regina on the scene before transporting her to a hospital. At the hospital, Regina received "almost 20" stitches to her face. She also was interviewed by police; body-worn camera footage of the interview was played for the jury and admitted into evidence. The statements Regina made during the interview were consistent with her testimony.

Regina's neighbor and friend, William Buce, also testified about the events of April 6, 2019. He stated that he was awakened by Regina's screams during the early morning hours. He left his tent and saw Regina outside her tent "on the sidewalk, laying on her back." Defendant was "on top of her, on her knees, going crazy," which Buce demonstrated by "clenching his left fist, bending his arm at the elbow, making a striking motion." Defendant seemed angry and mad. Regina was bleeding from her face. Buce did not see a weapon in defendant's hands.

Shortly after Buce arrived on the scene, defendant's husband "[r]eached out and grabbed her and pulled her away." Defendant struggled against him, saying, "Let me at her." When her husband released her, defendant "ran right back after" Regina. Defendant struck Regina and knocked her down. Regina fell onto the driveway of a nearby business, "and then she didn't move after that." Buce testified that "a crowd came around and broke it up." Defendant left the scene and walked toward her tent. Buce saw money in defendant's hand.

Regina, who was semi-conscious, told Buce that defendant had taken her money. Buce noticed that Regina had injuries "all around the knuckles and the top of her hands," as well as "an inch from her juggler [*sic*] vein" in her neck. He testified that he never saw Regina attack, try to attack, or threaten defendant.

Los Angeles Police Department officer Leslie Castro testified that she was dispatched to the scene of the altercation on April 6, 2019. She activated her body-worn camera when she arrived. Silent footage of Castro's search of defendant was played for the jury and admitted into evidence. Castro recovered a $50 bill, a $1 bill, and a fully intact glass pipe from defendant's person. Castro said she did not see any injuries on defendant, though on cross-examination she was impeached with testimony from the preliminary hearing, when she said she saw cuts on defendant's eye and finger. She did not see any broken glass pipes at the scene.

Castro interviewed Regina at the hospital later that day. She testified that Regina was bandaged but calm, and did not slur her words.

Defendant did not testify or call any witnesses.

## DISCUSSION

### I. Self-Defense Instruction

#### A. Background

During the jury instructions conference, defense counsel requested an instruction on self-defense. She asserted that Regina's testimony "that she was, at some point, on top of Ms. Williams; that she was holding her hands down; had her hands to Ms. Williams' neck; that she was trying to dig Ms. Williams' eyes out; trying to whoop Ms. Williams' ass" could "lead to a logical inference that Ms. Williams may have acted in self-defense." The

6

prosecutor responded that substantial evidence did not support a self-defense instruction. "[A]ccording to [Regina], [Regina] was the one defending herself after the defendant stood up, was brandishing that broken glass pipe and demanded her money. I don't think . . . [Regina] is required to lay down and let herself get robbed."

The court denied the instruction. It explained that Regina's testimony "was consistent that Ms. Williams was the aggressor from the beginning in this case; that she was an aggressor, utilizing deadly force; that she actually inflicted deadly force upon [Regina]; and, that [Regina], at all times, based on her account, was defending herself with force that seems to be reasonable under the circumstances. I just don't see how there's a reasonable inference that can be made from the testimony of [Regina] that this was in any way self-defense, based upon [Regina]'s account. [¶] This was an unprovoked attack that started as a robbery and wound up as assault with a deadly weapon; and frankly, the People may have a good argument for attempted murder, given the location of the wounds. They haven't charged that, and I wouldn't allow that at this point, but it appears to me they believe this to be an unprovoked attack. [Regina] did her best to defend, so I'm not gonna give that instruction."

### B. Legal Principles

The trial court is obligated to instruct on general principles of law relevant to the issues raised by the evidence, even in the absence of a request by the defendant. (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) This duty extends to instructions on defenses, if there is substantial evidence in support of the defense and it is not inconsistent with the defendant's theory of the case. (*Ibid.*)

7

"In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'" (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The trial court does not have a duty to give instructions based solely on conjecture and speculation. (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

To justify an act of self-defense, the defendant must have an honest and reasonable belief that bodily injury is imminent. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) The right of self-defense is limited to the use of force that itself is reasonable under the circumstances. (*Ibid.*)

## C.     Analysis

Defendant contends the trial court erred by failing to instruct the jury on self-defense. Acknowledging that she started the fight, she argues she was nevertheless entitled to an instruction on "imperfect self-defense," because substantial evidence showed that Regina "escalated the altercation when she attacked appellant, causing appellant to fall to the ground." We disagree.

"Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) We understand defendant to argue that she resorted to the self-defensive act of slashing Regina's face with the glass pipe because she feared imminent danger when Regina knocked her to the ground or "initially possessed the jagged glass pipe." This scenario is not supported by substantial evidence. The evidence showed that defendant initiated the altercation by brandishing a

8

broken pipe at Regina and demanding money from her. Defendant's initiation of the attack did not foreclose self-defense; "imperfect self-defense is available 'when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant.' (*Vasquez, supra,* 136 Cal.App.4th at pp. 1179-1180.)" (*People v. Ramirez* (2015) 233 Cal.App.4th 940, 947.)  The problem here is that there is no evidence that Regina responded unlawfully.  In response to a threat with a deadly weapon, Regina, who was unarmed, attempted to disarm defendant using only her own body.  Defendant speculates that Regina must have had the broken pipe, because the pipe found during defendant's arrest was intact.  This is not a reasonable inference from the evidence presented.

The primary authority on which defendant relies, *People v. Lemus* (1988) 203 Cal.App.3d 470, is distinguishable.  In *Lemus,* the prosecution presented evidence that the defendant mounted an unprovoked knife attack on the victim. The defendant testified that the victim verbally threatened him and struck him with his fists prior to the attack.  (*People v. Lemus, supra,* 203 Cal.App.3d at pp. 473, 476.)  The trial court refused to instruct the jury on self-defense, after apparently dismissing defendant's testimony as incredible.  (*Id.* at p. 477.) The Court of Appeal held that this was error: "[r]egardless of how incredible that evidence may have appeared, it was error for the trial court to determine unilaterally that the jury not be allowed to weigh and assess the credibility of [the defendant's] testimony in the context of reasonable belief in the necessity to defend himself against [the victim]." (*Id.* at p. 478.)  Here, in contrast, there was no evidence, credible or not,

9

that Regina threatened or attacked defendant prior to defendant's initiation of the altercation.

In her reply brief, defendant argues for the first time that Regina "had her arms pressed to appellant's throat." Even if this assertion had been properly presented in the opening brief, it too is unsupported by substantial evidence. Regina testified that she had her arms on defendant's throat, but further stated that she was not applying pressure and was trying to stop defendant from stabbing her. There is no evidence that she attacked defendant, or that the force with which defendant responded—numerous slashes with a jagged piece of glass—was a reasonable response. The court did not err in denying the self-defense instruction.

## II. *Romero* Motion

### A. Background

Prior to sentencing, defendant filed a *Romero* motion asking the court to strike her prior strike conviction, which stemmed from a 2010 incident in which defendant threatened to slit her neighbor's throat with a kitchen knife because the woman owed her $10. Defendant argued that the criminal threats conviction was remote in time, she had a "very long history of struggling with substance abuse," she had mental health issues, and was middle-aged. She asserted that "[a] grant of probation and a residential dual diagnosis treatment program would be ideal for [her] because it would address her mental health and drug issues and would also provide her with housing." Defendant also provided the court with a handwritten letter, in which she disclosed childhood sexual abuse, additional abuse she endured while living in Skid Row, and diagnoses of bipolar disorder and post-traumatic stress disorder.

10

At the sentencing hearing, defendant reiterated the arguments raised in her motion.  The prosecutor emphasized the similarity of the prior strike and current offenses, as well as defendant's failure to remain conviction-free in the intervening period.

The trial court denied the motion.  The trial court stated it was "sympathetic to her mental health and drug issues," as well as "her apparently troubled childhood."  However, the court also expressed concern about defendant's "virtually unabated" criminal record dating from 1991.  The court recognized that "most of her issues were non-violent," and that her record initially was "not the most serious record."  It then summarized the escalation of defendant's conduct:  "Up until 1997, 1999, where she had her first - -  what appears to be a crime of violence . . . a misdemeanor battery on a peace officer.  And then it continued[,] " with convictions for multiple grand thefts and drug offenses, criminal threats, and misdemeanor assault with a deadly weapon, for which she was on probation.

The court stated that its "biggest concern" was the "incredibly violent" nature of defendant's acts in the instant case.  "It is slash wounds with a knife or a bladed object to her face and neck, and could have easily . . . been an attempted murder. . . . [Regina] could have easily wound up with her throat slashed and her dead.  It could have been a murder.  It was a very aggravated 245."  Before denying the motion, the court reiterated that it could not "disregard her lengthy criminal history, nor her extreme amount of violence she perpetrated on the victim in this case."

11

### B. Legal Principles

When ruling on a *Romero* motion to strike a prior strike, the trial court must consider only factors "intrinsic to" the Three Strikes Law. (*People v. Williams* (1998) 17 Cal.4th 148, 161.) These factors include "the nature and the circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his [or her] background, character, and prospects." (*Ibid.*) The court must then determine whether, in light of these factors, the defendant "may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*Ibid.*) We review the trial court's determination for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) We will find abuse of discretion only "in limited circumstances," such as consideration of impermissible factors. (*Ibid.*) It is "'not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations." (*Id.* at p. 378.) So long as the "'record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we [will] affirm [its] ruling, even if we might have ruled differently in the first instance' [citation]." (*Ibid.*)

### C. Analysis

Defendant contends the trial court abused its discretion by relying on three "speculative and arbitrary reasons" to deny the motion. First, the trial court erroneously stated that she was convicted of battery on a peace officer. Second, it relied on the "unfounded fact" that she cut Regina with a "knife or bladed object," when the evidence at trial showed that she used a glass

pipe.  Third, the trial court improperly "believed that appellant should have been charged with attempted murder," and "speculated on the non-existent outcome of the assault offense." None of these contentions, individually or collectively, demonstrates an abuse of the court's discretion.

Defendant correctly states that she was not convicted of battery on a peace officer.  According to the probation report in the appellate record, defendant was arrested for battery on a peace officer or other official personnel (§ 243, subd. (b)) in 1999. However, the report further states that she ultimately was convicted of misdemeanor vandalism (§ 594, subd. (a)) as a result of that incident.  This factual error, which no one pointed out to the court, does not amount to an abuse of discretion.  The trial court expressly and appropriately considered defendant's entire criminal history, which included two other violent crimes, criminal threats (§ 422) and misdemeanor assault with a deadly weapon (§ 245, subd. (a)(1)), that were both closer in time to the instant offenses.  The single misstatement—of one of the 19 entries in defendant's criminal history—does not indicate reliance on improper factors. Indeed, the court's ultimate conclusion that defendant's criminal history was "lengthy, chronic, and continuous" is well-supported by the record.

Defendant next asserts the court improperly relied on unfounded facts when it stated that defendant cut Regina "with a knife or bladed object."  She asserts this fact "finds no support in the record," and contends the court improperly relied upon it when it found "the violence in this case to be highly aggravated; far beyond what was required for the robbery itself or for a

13

245(a)(1)."[3]  Defendant argues this reliance "on an improper fact that was critical to exercising sentencing discretion" was an abuse of discretion under *People v. Cluff* (2001) 87 Cal.App.4th 991 (*Cluff*).  We disagree.

Although a jagged shard of glass is neither a knife nor bladed object, we find no material difference here, where the point was that defendant used a dangerous weapon to slice Regina's face.  The cuts, which required approximately 20 stitches to mend, missed Regina's jugular vein by an inch.  The court reasonably concluded that Regina "could have easily wound up with her throat slashed and dead" during the struggle.  The nature and circumstances of a defendant's current offense are proper considerations on a *Romero* motion.

*Cluff* is distinguishable.  There, the current offense was not a violent felony, it was failure to register as a sex offender.  (See *Cluff*, *supra*, 87 Cal.App.4th at p. 996.)  The trial court denied Cluff's *Romero* motion and sentenced him to 25 years to life.  (See *id*. at p. 997.)  In doing so, it rejected his contention that the failure to register was a "simple technical violation" of the statute and instead "[g]ave considerable weight" to Cluff's four-month absence from the state and misstatements he made about his criminal history on a job application.  (*Id*. at pp. 1000-1002.)  The appellate court concluded this was an abuse of discretion because the trial court relied on "speculation, supposition, and guesswork" to infer that Cluff intended "to obfuscate his residence or escape the reach of law enforcement."  (*Id*. at p. 1003.)  The appellate court found that neither Cluff's extended visit in Utah—to help

---

[3] The court made this remark in the context of determining whether to sentence defendant to the low, middle, or high term on the robbery count.

14

his recently widowed sister—nor his false statements on a job application provided a basis from which to conclude he intended to evade law enforcement, particularly when the record showed that he still lived at the address he previously registered and kept his appointments with law enforcement. (See *id.* at pp. 995, 1003.) It held that critical inferences must be supported by substantial evidence. (*Id.* at p. 997.)

Here, the court's imprecise recollection of the type of weapon used was not a "critical inference." It also was not "speculation, supposition, [or] guesswork." Regardless of the weapon, the undisputed facts showed that defendant caused significant injury to Regina's face and neck region during the incident. The trial court properly considered the severity of the attack and Regina's injuries when ruling on the motion.

Defendant's contention that the court impermissibly inferred—and relied on the inference—that Regina could have been killed in the attack fails for the same reason. The head is "an obviously vulnerable area" (*People v. Saez* (2015) 237 Cal.App.4th 1177, 1189), and Buce testified that he saw cuts near Regina's jugular vein. The court did not abuse its discretion by inferring that Regina could have been killed, nor by considering both the location and extent of her injuries in assessing the severity of the current offense.

Defendant also suggests that the court did not appropriately consider mitigating factors, such as her mental health issues, substance abuse issues, and age. This suggestion is belied by the record. The court repeatedly acknowledged defendant's personal struggles during the hearing, indicating that it gave them due consideration in its analysis. None of the cases defendant cites required the court to weigh the mitigating

and aggravating factors differently. (See *People v. Garcia* (1999) 20 Cal.4th 490, 494; *In re Nunez* (2009) 173 Cal.App.4th 709, 732; *People v. Ruby* (1988) 204 Cal.App.3d 462.)

## III. Section 654

### A. Background

The trial court imposed a sentence of 10 years for the robbery, the base count. It then imposed an additional sentence of five years for the assault: one-third the midterm (one year), doubled to two years due to defendant's strike, plus three years for the great bodily injury. In doing so, the court found that the assault "is a separate offense. The violence inherent in any robbery is far less than what is required for this 245(a)(1). My recollection of the facts as well is that the violence continued after the demand and the acquisition of the property was made. So it was a separate 245 that occurred after the robbery was at least complete, in terms of taking possession of the property."

### B. Analysis

Defendant argues that the court should have stayed the sentence on the assault count because the assault "occurred either simultaneously with the robbery or contemporaneously while the two women were engaged in a struggle on the ground." We disagree.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Thus, if the robbery and assault constitute a single act, section 654 prohibits defendant from being punished for both.

16

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two step-inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts punished with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id.* at p. 312.) If the answer is yes, then the defendant may not be punished more than once for that act. If the answer is no, we proceed to step two, in which we consider whether the defendant's multiple acts, or course of conduct, "reflects a single 'intent and objective' or multiple intents and objectives." (*Id.* at p. 311.) A course of conduct reflecting a single intent and objective may not be punished more than once; the same is true of a course of conduct that is "indivisible and the two crimes were committed so close in time that they were contemporaneous if not simultaneous." (*People v. Nuñez* (2012) 210 Cal.App.4th 625, 629.)

"Whether multiple convictions are based upon a single act is determined by examining the facts of the case." (*People v. Mesa* (2012) 54 Cal.4th 191, 196.) Likewise, "[i]ntent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) We review the court's findings for substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

Substantial evidence supports the court's findings here. Regina testified that defendant removed money from her bra while the women were struggling in the tent. After the theft,

17

defendant continued to accost Regina, inflicting serious injuries on her face and causing her to lose consciousness.  When the amount of force used to achieve a robbery far exceeds that necessary, it may be considered evidence of a separate objective and intent.  (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 272.)  Moreover, Buce testified that defendant commenced a second attack on Regina after her husband interrupted the first attack.  The court reasonably concluded from this evidence that the offenses were separate.

## DISPOSITION

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


MANELLA, P. J.


WILLHITE, J.

18